358 F.3d 223
 Juanita SWEDENBURG, in her own capacity, Juanita Swedenburg, as proprietor of Swedenburg Winery, a Virginia partnership, David Lucas, in his own capacity, David Lucas, as proprietor of The Lucas Winery, a California sole proprietorship, Patrick G. Fitzgerald, Cortes Derussy, Robin Brooks, Plaintiffs-Appellees,
v.
Edward F. KELLY, Chairman of the State Liquor Authority, Division of Alcoholic Beverage Control, State of New York, in his official capacities, Lawrence J. Gedda, Commissioner of the New York State Liquor Authority, Division of Alcoholic Beverage Control, State of New York, in his official capacities, Joseph Zariello, Commissioner of the New York State Liquor Authority, Division of Alcoholic Beverage Control, State of New York, in his official capacities, Defendants-Appellants,
CHARMER INDUSTRIES, INC., Premier Beverage Company LLC, Peerless Importers Inc, Local 2D of the Allied Food and Commercial Workers International Union, Eber Brothers Wine and Liquor Corp, Metropolitan Package Store Association, Inc. Intervenor-Defendants-Appellants.
 Docket No. 02-9511.
 Docket No. 03-7089.
 United States Court of Appeals, Second Circuit.
 Argued: September 3, 2003.
 Decided: February 12, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Clint Bolick, Institute for Justice, Washington, District of Columbia (William M. Mellor, Steven M. Simpson, Institute for Justice, Lance J. Gotko, Friedman Kaplan Seiler & Adelman LLP, New York, New York, on the brief) for Plaintiffs-Appellees.
 Deon J. Nossel, Assistant Solicitor General, Department of Law, State of New York, New York, New York (Eliot Spitzer, Attorney General for New York State) (Caitlin J. Halligan, Solicitor General, Michael S. Belohlavek, Deputy Solicitor General, on the brief) for Defendants-Appellants.
 Randy M. Mastro, Gibson, Dunn & Crutcher LLP, New York, New York (Michael G. Honeymar, Jr., Gibson, Dunn & Crutcher, LLP, New York, New York, Deborah A. Skakel, Victoria A. Kummer, Dickstein Shapiro Morin & Oshinsky LLP, New York, New York, J. Warren Mangan, O'Connor & Mangan, P.C., Long Island City, New York, Robert M. Heller, Kramer Levin Naftalis & Frankel LLP, New York, New York, Alan J. Gardner, Verini & Gardner, New York, New York, John F. O'Mara, Davidson & O'Mara, Elmira, New York, on the brief) for Intervenor-Defendants-Appellants Peerless Importers Inc., Charmer Industries, Inc., Local 2d of the Allied Food and Commercial Workers International Union, Premier Beverage Company LLC, Metropolitan Package Store Association, Inc., and Eber Brothers Wine & Liquor Corp.
 Howard Graff, Dickstein Shapiro Morin & Oshinsky LLP, New York, New York for Intervenor-Defendant-Appellant Charmer Industries, Inc.
 Frederick P. Schaffer, Esq., New York, New York for City University of New York, State University of New York, Fordham University, and St. Francis College, Amicus Curiae.
 Louis R. Cohen, Wilmer Cutler & Pickering, Washington, District of Columbia (C. Boyden Gray, Todd Zubler, on the brief) (M. Craig Wolf, Wine & Spirits Wholesalers of America, Inc., Washington, District of Columbia, of counsel) for Wine and Spirits Wholesalers of America, Inc., National Association of Beverage Importers, American Beverage Licensees, National Beer Wholesalers Association, Coalition of Licensed Beverage Associations, and Presidents' Forum on the Beverage Alcohol Industry, Amicus Curiae.
 Elizabeth C. Dribusch, Glenmont, New York (Kathleen S. Holland on the brief) for New York Farm Bureau, Inc., Amicus Curiae.
 Robert S. Getman, New York, New York for WineAmerica, Amicus Curiae.
 Leah B. Warnick, McKenna Long & Aldridge LLP, Washington, District of Columbia (Michael J. Bearman, Daniel G. Jarcho, on the brief) for Consumer Alert, Amicus Curiae.
 Kenneth W. Starr, Kirkland & Ellis, Washington, District of Columbia (Kannon K. Shanmugam, Susan Kearns, Kirkland & Ellis, Tracy K. Genesen, Kirk E. Trost, Miller Owen & Trost, Sacramento, CA, on the brief) for Family Winemakers of California and Coalition for Free Trade, Amicus Curiae.
 Before: NEWMAN, SOTOMAYOR, and WESLEY, Circuit Judges.
 
 
 1
 WESLEY, Circuit J.
 
 
 2
 On December 6, 1933, the New York Times declared that "[p]rohibition of alcoholic beverages as a national policy ended at 5:32 ½ p.m. Eastern Standard Time" when Utah became the thirty-sixth state to ratify the Twenty-first Amendment. Final Action at Capital, N.Y. TIMES, Dec. 6, 1933, at 1. Utah had seen fit to delay its vote so that it might have the "honor" of ending the Prohibition era — Pennsylvania and Ohio had ratified the Amendment earlier that day. As the nation prepared to return to the legal use of alcohol, extra quotas of Canadian whiskies were made ready at the border while leaders of the Anti-Saloon League lamented that the sponsors of repeal would have to accept responsibility for the "evils of liquor." Id. at 2. The noble experiment, as President Hoover had called it, was at an end.
 
 
 3
 The Twenty-first Amendment is unequaled in our constitutional experience — it repeals one constitutional provision and creates an exception to another. The Amendment was not a narrow legislative delegation of federal authority; it was the will of a nation speaking through its constitutional process. The Amendment brought an end to Prohibition while reaffirming the states' power to control the delivery or use of alcohol within their borders. Section 2 of the Twenty-first Amendment prohibits "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof." U.S. Const. amend XXI, § 2. The language of this simple and straightforward amendment has not changed in the last seventy years. But the jurisprudence that gives the Amendment its life and effect has changed its sweep.
 
 
 4
 This case requires us to reconcile the competing demands of the Twenty-first Amendment's grant of authority to the states to regulate the intrastate traffic of alcohol, with the power reserved to Congress under the Commerce Clause "[t]o regulate Commerce ... among the several States." U.S. Const. art. 1, § 8, cl. 3. Thus, we must determine whether New York's alcohol regulatory regime, insofar as it relates to the direct shipment of wine to New York consumers, is properly within the scope of section 2 of the Twenty-first Amendment, such that it is exempted from "the normal operation of the Commerce Clause," or more precisely, the dormant Commerce Clause. Craig v. Boren, 429 U.S. 190, 206, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). We conclude that the challenged regime is within the ambit of the Twenty-first Amendment and also does not violate the Privileges and Immunities Clause. We hold, however, that section 102(1)(a) of the State's regulatory regime violates the First Amendment insofar as it prohibits all commercial speech pertaining to the sale of alcoholic beverages directed to New York consumers by unlicensed entities.
 
 BACKGROUND
 A. New York's Regulatory Regime
 
 5
 Shortly following the ratification of the Twenty-first Amendment, New York, like most states, adopted a three-tiered system for the sale and distribution of alcoholic beverages. See N.Y. Alco. Bev. Cont. Law § 100(1) (McKinney 2000). One of the fundamental principles of the system is that all sales of alcohol within New York must be made to or by state-licensed entities. To this end, section 100(1) of New York's Alcoholic Beverage Control Law (the "ABC Law") provides that "[n]o person shall manufacture for sale or sell at wholesale or retail any alcoholic beverage within the state without obtaining the appropriate license therefor required by this chapter." Id. Section 102(1)(c) of the ABC Law also provides in relevant part that "[n]o alcoholic beverages shall be shipped into the state unless the same shall be consigned to a person duly licensed hereunder to traffic in alcoholic beverages."[1] Id. In addition, the ABC Law prohibits a common carrier or any other person from bringing or carrying any alcoholic beverages into the state "unless the same shall be consigned to a person duly licensed hereunder to traffic in alcoholic beverages." Id. § 102(1)(d).
 
 
 6
 Generally, the license application process is rigorous to ensure that only reputable individuals and their companies enter the alcoholic beverage trade. Applicants must identify any person with an interest in the business along with the sources of funds used in the licensed business. Id. § 110(1)(g). Licensees must also post an appropriate penal bond that may be subject to forfeiture for violation of the ABC Law or State Liquor Authority ("SLA") regulations. Id. § 112; N.Y. Comp.Codes R. & Regs. tit. 9, §§ 81.1-81.7 (2003). A conviction for a felony or certain misdemeanors precludes a person from obtaining a license, N.Y. Alco. Bev. Cont. Law § 126(1) (McKinney 2000), and any person who commits a violation of the ABC Law cannot obtain a license for a period of two years. Id. § 126(5). Additionally, licensees must maintain adequate books and records on their premises and make them available for inspection by the SLA. Id. §§ 103(7), 104(10), 105(15), 106(12). These requirements facilitate the SLA's role in generating and collecting tax revenue, and in ensuring that licensees comply with the provisions of New York's regulatory scheme.
 
 
 7
 Section 76 of the ABC Law sets forth the requirements for obtaining a New York winery license. As defined under the ABC Law, a licensed winery is one that has paid the required licensing fee, id. § 76, and "has and maintains a branch factory, office or storeroom within the state of New York and receives wine in this state consigned to a United States government bonded winery, warehouse or storeroom located within the state." Id. § 3(37).[2] Licensed wineries enjoy important privileges in New York's regulatory scheme. For example, a licensed winery may sell and ship its wine to another licensed winery, a wholesaler or a retailer. Id. § 77(1). More importantly, however, a licensed winery may also obtain a retail license, allowing it to sell and ship its wines directly to consumers. Id. §§ 76(4), 77(2). Thus, unlike in other states,[3] out-of-state wineries are permitted to seek and obtain a New York license to distribute and sell alcohol. They must, however, comply with the licensing requirements of the ABC Law, including establishing and maintaining a physical presence in New York.
 
 B. Decision Below
 
 8
 Plaintiffs-appellees, Juanita Swedenburg and David Lucas, proprietors of two out-of-state wineries, and Patrick Fitzgerald, Cortes DeRussy and Robin Brooks, New York wine consumers, filed this action against New York State seeking a declaration that sections 102(1)(a), (c) and (d) of New York's ABC Law are facially unconstitutional under the Commerce Clause, the Privileges and Immunities Clause, and the First Amendment. Plaintiffs-appellees claim sections 102(1)(c) and (d) violate the dormant Commerce Clause because they prevent the winery plaintiffs-appellees from shipping their wine products directly to New York consumers. The wineries contend that based on their size — Swedenburg estimates New York sales of only 120 to 180 bottles of wine a year — direct sales to consumers through a website or the mail are their only possible access to the New York market. Thus, plaintiffs-appellees argue the licensing scheme provides an unconstitutional advantage to in-state wineries and is not "saved" by the Twenty-first Amendment. They also contend that section 102(1)(a) impermissibly bans out-of-state purveyors from soliciting orders from New York consumers, thereby violating the First Amendment.
 
 
 9
 State defendants and intervening defendants, wholesale distributors of alcohol, (collectively, "defendants-appellants"), argue that the regulatory scheme operates evenhandedly with respect to in-state and out-of-state interests, and thus does not improperly discriminate against out-of-state wineries. Defendants-appellants further argue that, in any event, the regulatory scheme is excepted from dormant Commerce Clause scrutiny, as it is a proper exercise of the State's authority under the Twenty-first Amendment to regulate the importation and distribution of alcohol for delivery or use within its borders.
 
 
 10
 Defendants-appellants moved to dismiss the complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), but the district court denied the motion. After discovery, the parties cross-moved for summary judgment. The district court granted plaintiffs-appellees' motion. See Swedenburg v. Kelly, 232 F.Supp.2d 135 (S.D.N.Y. 2002). Relying on the method of analysis utilized by a number of other federal courts in similar challenges, the district court first found that the New York regime directly discriminated against interstate commerce. Id. at 145. The court then held that the ban on direct shipment of out-of-state wine by non-licensed wineries did not "implicate the State's core concerns under the Twenty-first Amendment," and thus, the ban was not insulated from a dormant Commerce Clause attack. Id. at 148.[4]
 
 
 11
 The court rejected the State's contention that the "presence" requirement of the statute cured its alleged discriminatory effect. "It appears unreasonable to this Court to require that an out-of-state winemaker `become a resident in order to compete on equal terms.'" Id. at 146 (quoting Halliburton Oil Well Cementing Co. v. Reily, 373 U.S. 64, 72, 83 S.Ct. 1201, 10 L.Ed.2d 202 (1963)). The district court noted that the Supreme Court has viewed with substantial suspicion state statutes requiring that business operations be performed in the regulating state that could more efficiently be performed elsewhere. Id. With regard to the First Amendment claim, the court held that "[h]aving concluded that New York's ban on direct shipment of wine into the state is unconstitutional, Section 102(1)(a) may similarly, going forward, be read to prohibit lawful solicitations on behalf of out-of-state wineries—and needs to be revised." Id. at 152.
 
 
 12
 After further submissions and oral argument by the parties, the court entered judgment enjoining State defendants-appellants from enforcing section 102(1)(c) and (d) in a manner that "would prohibit (i) the winery plaintiffs from shipping their wine to New York consumers on the same terms and conditions applicable to New York wineries and (ii) the consumer plaintiffs from receiving wines shipped directly to them from out-of-state wineries on the same terms and conditions applicable to consumers of New York wineries."[5] Swedenburg v. Kelly, 232 F.Supp.2d 135 (S.D.N.Y.2002). The court further enjoined State defendants-appellants from enforcing section 102(a) "against the winery plaintiffs in a manner that would prevent them from conveying lawful information to New York consumers on the same terms and conditions applicable to New York wineries." Id.
 
 
 13
 State defendants and intervenor-defendants appealed.
 
 DISCUSSION
 
 14
 I. CONSTITUTIONALITY OF THE REGULATORY SCHEME UNDER THE TWENTY-FIRST AMENDMENT
 
 A. Analytical Framework
 
 15
 We do not approach this case with a blank slate. Five other circuits have decided similar cases; a common thread runs throughout.[6] Each challenged a state regulatory scheme that prohibited out-of-state wineries from importing and selling wine directly to consumers, but permitted local wineries to avoid the three-tier distribution system with direct sales to consumers. Four circuits have struck down the regulatory schemes in question, utilizing a two-step analytical framework, similar to that used by the district court here, in which the statute is first examined in the context of the dormant Commerce Clause. Heald v. Engler, 342 F.3d 517, 524 (6th Cir.2003); Dickerson v. Bailey, 336 F.3d 388, 400 (5th Cir.2003); Beskind v. Easley, 325 F.3d 506, 514 (4th Cir.2003); Bainbridge v. Turner, 311 F.3d 1104, 1108 (11th Cir.2002). Under traditional dormant Commerce Clause analysis, a state regulation is unconstitutional if it "affects interstate commerce in a manner either that (i) discriminates against interstate commerce, or (ii) imposes burdens on interstate commerce that are incommensurate with putative local gains." Brown & Williamson Tobacco Corp. v. Pataki, 320 F.3d 200, 208 (2d Cir.2003) (internal quotation marks and citations omitted); see also Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205 (2d Cir.2004). In each of the four circuit court cases, the regulatory scheme at issue was found to be facially discriminatory in violation of the dormant Commerce Clause. Heald, 342 F.3d at 525; Dickerson, 336 F.3d at 402-03; Beskind, 325 F.3d at 515; Bainbridge, 311 F.3d at 1109-11. Notwithstanding a finding that the regulatory scheme violates the dormant Commerce Clause, the statute can be "saved" by the Twenty-first Amendment in the second step, but only if it advances one of the Amendment's "core concerns." Under this two-tier analysis, none of the state statutes regulating the importation of alcohol were saved by the Twenty-first Amendment core concern examination. See Heald, 342 F.3d at 526-27; Dickerson, 336 F.3d at 403-07; Beskind, 325 F.3d at 516-17; Bainbridge, 311 F.3d at 1111-15. We think this two-step approach is flawed because it has the effect of unnecessarily limiting the authority delegated to the states through the clear and unambiguous language of section 2.[7]
 
 
 16
 A second mode of analysis recognizes that "[b]oth the Twenty-first Amendment and the Commerce Clause are parts of the same Constitution," and considers each "in the light of the other, and in the context of the issues and interests at stake in any concrete case." Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 332, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964). In this vein, the second mode of inquiry considers the scope of the Twenty-first Amendment's grant of authority to the states to determine whether the challenged statute is within the ambit of that authority, such that it is exempted from the effect of the dormant Commerce Clause. See Craig, 429 U.S. at 206, 97 S.Ct. 451. We adopt this approach acknowledging that only one other circuit court has employed it in a similar case. See Bridenbaugh v. Freeman-Wilson, 227 F.3d 848 (7th Cir.2000) (upholding an Indiana statute restricting the direct shipment of wine on the ground that it was a permissible expression of the state's authority under section 2 of the Twenty-first Amendment). The inquiry, in our view, should not allow the protective doctrine of the dormant Commerce Clause to subordinate the plain language of the Twenty-first Amendment. Instead, the inquiry should be sensitive to the manner in which these two constitutional forces interact in light of the impact the Twenty-first Amendment has on dormant Commerce Clause concerns.
 
 
 17
 B. The Legal History of the Twenty-first Amendment
 
 
 18
 While the language of section 2 is clear, it is helpful to understand the jurisprudential and statutory context of its birth. Prior to the Eighteenth Amendment and nationwide prohibition of alcohol, many states attempted to ban the production and consumption of alcohol, but found their efforts thwarted by Supreme Court decisions invoking the doctrine now known as the dormant Commerce Clause. See, e.g., Bowman v. Chicago & N.W. Ry. Co., 125 U.S. 465, 481, 493-94, 8 S.Ct. 689, 31 L.Ed. 700 (1888) (invalidating under the dormant Commerce Clause a state law restricting the importation of liquor to those possessing a permit); Leisy v. Hardin, 135 U.S. 100, 10 S.Ct. 681, 34 L.Ed. 128 (1890) (holding that, even after importation, liquor contained in its original package remained an article of interstate commerce, subject to federal Commerce Clause authority). As a result of the Court's decisions, "dry" states found themselves in the unenviable position of being able to prohibit consumption of domestic liquor but helpless to stop the importation of liquor from outside their borders. See Bridenbaugh, 227 F.3d at 852 (recounting pre-Prohibition jurisprudence).
 
 
 19
 Congress reacted by enacting the Wilson Act, ch. 728, 26 Stat. 313 (1890), which gave states the authority to regulate imported liquor "to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise." Id. (emphasis added). The Wilson Act's language signaled Congress' intent to allow states to regulate imported alcohol in the same manner as domestically produced alcohol.
 
 
 20
 The Supreme Court, however, narrowly construed the Wilson Act, permitting states to regulate the resale of imported liquor in its original package, but preventing the regulation of direct shipments to in-state consumers by out-of-state distributors. Rhodes v. Iowa, 170 U.S. 412, 423-25, 18 S.Ct. 664, 42 L.Ed. 1088 (1898). Congress responded with the Webb-Kenyon Act, ch. 90, 37 Stat. 699 (1913), which prohibited "the shipment or transportation, in any manner or by any means whatsoever, of any ... liquor of any kind, from one State ... into any other State which... is intended, by any person interested therein, to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law of such State...." Id. The Act's broad language ensured that dry states had the authority to prevent the importation of alcohol across their borders. By the time the Supreme Court upheld the Webb-Kenyon Act in Clark Distilling Co. v. Western Maryland Railway Co., 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326 (1917), the temperance movement had gained considerable ground throughout the nation. And in 1919, the Eighteenth Amendment set the nation on a course of national prohibition and ended the states' legal struggle to regulate alcohol.
 
 
 21
 The ratification of the Twenty-first Amendment did not return the Constitution to its pre-1919 form. Most states wished to control alcohol use within their borders. Accordingly, the language of section 2 of the Twenty-first Amendment, "closely follow[ed] the [language of] the Webb-Kenyon and Wilson Acts," Craig, 429 U.S. at 205-06, 97 S.Ct. 451, thereby prohibiting "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof." U.S. Const. amend. XXI, § 2. Section 2 effectively constitutionalizes most state prohibitions regulating importation, transportation, and distribution of alcoholic beverages from the stream of interstate commerce into the state.
 
 
 22
 Because section 2 speaks directly to the importation of liquor into the state, dormant Commerce Clause jurisprudence could no longer be employed to insulate interstate shipments of liquor from state regulation, as almost "[e]very use of § 2 could be called `discriminatory' in the sense that ... every statute limiting [interstate] importation leaves intrastate commerce unaffected." Bridenbaugh, 227 F.3d at 853 (emphasis in original). Allowing dormant Commerce Clause concerns to restrict state regulatory schemes that focus on the importation of liquor would render section 2 a nullity.
 
 C. Analysis
 
 23
 Section 2 of the Twenty-first Amendment grants "the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system." California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 110, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). This constitutional grant of authority should not, we think, be subordinated to the dormant Commerce Clause inquiry when the two provisions conflict, as they do here. Plaintiffs-appellees argue that the scope of section 2's grant of authority to the states has been narrowed by a series of Supreme Court decisions. The end result, they posit, is that a state law regulating the importation of interstate liquor is a proper exercise of the state's section 2 power only if it regulates in a non-discriminatory manner and is intended to advance the "core concerns" of the Twenty-first Amendment — namely temperance, the promotion of orderly market conditions, and revenue production. See North Dakota v. United States, 495 U.S. 423, 432, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990) (plurality opinion).
 
 
 24
 We disagree with the proposition that the Supreme Court's Twenty-first Amendment jurisprudence confines the scope of section 2 to state regulations that advance so-called core concerns. In our view, although the Supreme Court's Twenty-first Amendment jurisprudence has to some degree cabined the scope of section 2, it has done so only insofar as it has limited section 2's grant of authority to its plain language. That is, the Supreme Court has consistently recognized only that, under section 2, a state may regulate the importation of alcohol for distribution and use within its borders, but may not intrude upon federal authority to regulate beyond the state's borders or to preserve fundamental rights.[8]
 
 
 25
 1. Early Twenty-first Amendment Jurisprudence
 
 
 26
 In the years immediately following the Twenty-first Amendment's ratification, the Supreme Court recognized the Amendment's extensive delegation of authority to the states. In State Board of Equalization v. Young's Market Co., 299 U.S. 59, 57 S.Ct. 77, 81 L.Ed. 38 (1936), a unanimous Court upheld a California statute that imposed a licensing fee for the privilege of importing beer into the state against a dormant Commerce Clause challenge raised by a group of out-of-state beer importers. In so doing, the Court acknowledged that, "[p]rior to the Twenty-First Amendment it would ... have been unconstitutional" to impose the challenged licensing fee. Id. at 62, 57 S.Ct. 77. The Twenty-first Amendment, however, "confer[red] upon the state the power to forbid all importations which do not comply with the conditions which it prescribes." Id.
 
 
 27
 Two years later, the Court, again unanimously, upheld a Minnesota statute that clearly discriminated against imported liquors by imposing an alcohol-content requirement not imposed on domestically-produced liquors. See Mahoney v. Joseph Triner Corp., 304 U.S. 401, 58 S.Ct. 952, 82 L.Ed. 1424 (1938). The Court noted that "under the amendment, discrimination against imported liquor is permissible although it is not an incident of reasonable regulation of the liquor traffic." Id. at 403, 58 S.Ct. 952; see also Ziffrin v. Reeves, 308 U.S. 132, 60 S.Ct. 163, 84 L.Ed. 128 (1939).
 
 
 28
 These early cases established that section 2 provided the states with the authority to enact legislation for the regulation of alcohol traffic within its borders, even where those regulations operated to the disadvantage of out-of-state interests. Although some courts — including our sister circuits—appear to have distanced themselves from these early cases,[9] they have never been overruled.
 
 
 29
 2. Contemporary Twenty-first Amendment Jurisprudence
 
 
 30
 We acknowledge that more recent cases have recognized that the Twenty-first Amendment is not a plenary grant of authority to states to regulate all activity involving alcohol. As the Supreme Court has noted, "[o]nce passing beyond consideration of the Commerce Clause, the relevance of the Twenty-first Amendment to other constitutional provisions becomes increasingly doubtful." Craig, 429 U.S. at 206, 97 S.Ct. 451 (considering the impact of the Twenty-first Amendment on an Equal Protection challenge to a state law prescribing different drinking ages for males and females); see also 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 516, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (considering the impact of the Twenty-first Amendment in the context of a First Amendment challenge to a state statute prohibiting advertisement of liquor prices). Section 2's grant of authority to the state to regulate alcohol within its borders could not sustain state statutes that violated individual liberties protected by other constitutional provisions.
 
 
 31
 Similarly, in Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964), the Court struck down New York's attempt to prohibit the sale of liquor to internationally-bound travelers at a duty-free airport shop operating under the supervision of the United States Bureau of Customs. Id. at 329, 84 S.Ct. 1293. In so holding, the Court rejected the view that "the Twenty-first Amendment has somehow operated to `repeal' the Commerce Clause wherever regulation of intoxicating liquors is concerned." Id. at 331-32, 84 S.Ct. 1293. Such a view, the Court declared, would effectively strip Congress of its "regulatory power over interstate or foreign commerce in intoxicating liquor." Id. at 332, 84 S.Ct. 1293. The Idlewild Court distinguished the earlier Twenty-first Amendment cases, such as Young's Market, Mahoney, and Ziffrin, on the ground that, in those cases, liquor was being imported and distributed into the state's territory, and thus, the challenged statutes permissibly regulated the intrastate traffic of alcohol. Id. at 330-31, 84 S.Ct. 1293. In contrast, the alcoholic beverages that New York sought to regulate in Idlewild were held on federal property and were intended for overseas sale. In light of these considerations, the Court determined that New York's authority, under the Twenty-first Amendment, to regulate the flow of alcohol within its borders was not implicated by the facts in Idlewild. Id. at 333, 84 S.Ct. 1293.
 
 
 32
 In Department of Revenue v. James B. Beam Distilling Co., 377 U.S. 341, 84 S.Ct. 1247, 12 L.Ed.2d 362 (1964), the Court invalidated a state law seeking to impose a tax on alcohol imported from Scotland on the ground that it violated the Constitution's Export-Import Clause. Id. at 346, 84 S.Ct. 1247. The Court reiterated it had "no doubt" that Kentucky could regulate alcohol "destined for distribution, use, or consumption within its borders." Id. Section 2, however, did not give the state the power to impose a tax "clearly of a kind prohibited by the Export-Import Clause." Id. at 343, 84 S.Ct. 1247. In both Idlewild and James B. Beam Distilling, the point of differentiation from the Young's Market line of cases was the fact that in the earlier cases, the state's regulatory efforts were confined to the interstate importation and intrastate distribution of alcohol, and therefore did not impermissibly intrude on regulatory powers reserved to the federal government.
 
 
 33
 Two decades after Idlewild and James B. Beam Distilling, the Court reemphasized the view that the Twenty-first Amendment is not without limits when a state regulatory scheme conflicts with valid federal concerns. In California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Court, upon finding that a California wine-pricing program violated the Sherman Act, considered whether section 2 "permit[ted] California to countermand the congressional policy — adopted under the commerce power — in favor of competition." Id. at 106, 100 S.Ct. 937. Ultimately, the Court concluded that because federal antitrust concerns animating the Sherman Act outweighed California's desire to protect small liquor retailers from predatory pricing schemes of larger retailers, section 2 could not salvage the offending statute. Id. at 114, 100 S.Ct. 937. Four years later, in Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984), the Court echoed Midcal's refrain, holding unconstitutional an Oklahoma statute that required in-state television operators to delete advertisements for alcoholic beverages contained in the out-of-state signals that they retransmitted by cable to Oklahoma subscribers. In striking down the law, the Court reiterated that the Twenty-first Amendment had not repealed the Commerce Clause, and declared that when a state statute does not directly regulate the sale or use of liquor within the state's borders, a conflicting exercise of federal authority may prevail. Id. at 713, 104 S.Ct. 2694.
 
 
 34
 The Supreme Court has also viewed with caution state attempts to invoke section 2 as a pretext for economic protectionism. In Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), Hawaii imposed an excise tax on liquor sales at wholesale, while exempting certain locally produced alcoholic beverages. The Court invalidated the Hawaiian tax on the grounds that it was intended to "favor local liquor industries," and therefore was preempted by "strong federal interests in preventing economic Balkanization" and promoting a unified national market.[10] Id. at 276, 104 S.Ct. 3049. In Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986), the Court struck down a New York statute that required state-licensed distillers to comply with a price schedule that established prices for local liquor sales no higher than the lowest price the distiller charged in other states. The Court recognized that the statute could, in effect, control the prices of alcoholic beverages in neighboring states. Id. at 582-84, 106 S.Ct. 2080. Thus, the Court concluded that the statute was an impermissible extraterritorial attempt to regulate liquor prices. Id. at 585, 106 S.Ct. 2080; see also Healy v. Beer Inst., 491 U.S. 324, 342, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) (affirming Brown-Forman's holding that "the Twenty-first Amendment does not immunize state laws from invalidation under the Commerce Clause when those laws have the practical effect of regulating liquor sales in other States").
 
 
 35
 In each of these cases, the Supreme Court was called upon to resolve competing claims of constitutional authority. In each, the Court "limited" the scope of section 2 only insofar as it related to a state's attempt to regulate the traffic of alcohol outside of its borders or in violation of other powers reserved to the federal government. However, in each case, the Court unequivocally reaffirmed the principle that insofar as section 2 permits each state to regulate alcohol traffic within its borders it "primarily created an exception to the normal operation of the Commerce Clause." Craig, 429 U.S. at 206, 97 S.Ct. 451.[11] The Supreme Court has neither held nor implied that laws prescribing regulations for the importation and distribution of alcohol within a state's borders "are problematic under the dormant commerce clause." Bridenbaugh, 227 F.3d at 853. Indeed, as the language of the Amendment and the Court's jurisprudence amply demonstrate, section 2's powers are directed specifically towards intrastate regulation and traffic of liquor.
 
 
 36
 This limited interpretation of section 2 is consistent with the political and cultural forces animating Prohibition and its subsequent repeal by the Twenty-first Amendment. That is, the impact of the dormant Commerce Clause has always been an issue relating to state efforts to regulate the flow of liquor within its borders. Following a series of federal statutory efforts to provide states with the legal wherewithal to regulate intrastate alcohol traffic, the Eighteenth Amendment prohibited the flow of alcohol on a national level. With Prohibition's repeal, the drafters of the Twenty-first Amendment crafted section 2 to allow states the authority to circumvent dormant Commerce Clause protections, provided that they were regulating the intrastate flow of alcohol.
 
 3. New York's Regulatory Regime
 
 37
 New York's regulatory regime falls squarely within the ambit of section 2's grant of authority. The statutory scheme regulates only the importation and distribution of alcohol in New York. New York's prohibition of the sale and shipment of wine by unlicensed wineries directly to New York consumers serves valid regulatory interests. The statute allows the state to monitor the distribution and sale of alcoholic beverages by permitting such distribution and sale only through state-licensed entities supervised by, and accountable to, the SLA.
 
 
 38
 Although we are sensitive to the Supreme Court's instruction that "[s]tate laws that constitute mere economic protectionism are ... not entitled to the same deference as law enacted to combat the perceived evils of an unrestricted traffic in liquor," Bacchus, 468 U.S. at 276, 104 S.Ct. 3049, we find no indication, based on the facts presented here, that the regulatory scheme is intended to favor local interests over out-of-state interests. All wineries, whether in-state or out-of-state, are permitted to obtain a license as long as the winery establishes a physical presence in the state. Wine that is delivered to a branch office or warehouse can then be shipped directly to consumers.
 
 
 39
 Presence ensures accountability. Records of sales and compliance with New York's regulatory requirements must be available for inspection by SLA officials. Violations are subject to disciplinary measures carried out in New York, including fines imposed against the bond all license holders are required to post. New York treats wine importers the same as it treats internal sellers; all must either utilize the three-tier system or obtain a physical presence from which the state can monitor and control the flow of alcohol.
 
 
 40
 We fully recognize that the physical presence requirement could create substantial dormant Commerce Clause problems if this licensing scheme regulated a commodity other than alcohol. When a state statute, whether on its face or in effect, discriminates against interstate commerce, it is virtually per se invalid unless the State can justify the discrimination "both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 353, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).
 
 
 41
 Here, the requirement that all wine be shipped through a New York warehouse is a precondition to direct consumer sales. We recognize that "state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere ... ha[ve] been declared to be virtually per se illegal." Pike v. Bruce Church, Inc., 397 U.S. 137, 145, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); see also C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994); South-Central Timber Dev. v. Wunnicke, 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984). But business efficiency must give way to valid regulatory concerns in this unique area of commerce. Under this scheme, out-of-state wineries will incur some costs in establishing and maintaining a physical presence in New York, costs not incurred by in-state wineries. These effects, however, do not alter the legitimacy of section 2's delegation of authority. While it may be an additional expense for out-of-state wineries to be present in New York, they gain access to a market not available to others — direct sales to consumers. The fact that some out-of-state wineries will have greater costs than others (out-of-state or in-state) in accessing the market is not determinative.[12] New York has chosen to relax its regulatory grip for wineries to sell directly to consumers. It has not barred out-of-state wineries from the opportunity; it has correlated its relaxation of regulatory scrutiny with a safety net ensuring accountability — presence. See Milton S. Kronheim & Co. v. District of Columbia, 91 F.3d 193, 204 (D.C.Cir.1996).
 
 
 42
 New York's desire to ensure accountability through presence is aimed at the regulatory interests directly tied to the importation and transportation of alcohol for use in New York. See North Dakota, 495 U.S. at 432, 110 S.Ct. 1986 (plurality opinion) ("In the interest of promoting temperance, ensuring orderly market conditions, and raising revenue, the State has established a comprehensive system for the distribution of liquor within its borders. That system is unquestionably legitimate."). All wine will pass through a warehouse located in New York, allowing state officials access to the product. As noted above, every licensee must maintain books and records on premises available for inspection at any time by the SLA.
 
 
 43
 In 2000, there were over 2,100 wineries in the country, a 275% increase since 1975. Requiring New York officials to traverse the country to ensure that direct sales to consumers (no matter how small) comply with New York law would render the regulatory scheme useless.[13] Section 2 does not require that New York bear the burden in attempting to ensure proper compliance with its tax and regulatory system regarding imported wine. New York's "motives of legitimate state interests which would be promoted by requiring [physical presence], e.g., auditing company records, monitoring compliance with the ABC laws, monitoring licenses, checking tax forms for audits, etc., fall[ ] ... squarely within the state's core enforcement powers over alcohol." Kronheim, 91 F.3d at 203-04 (internal quotation marks and citation omitted).
 
 
 44
 The winery plaintiffs presented compelling proof that boutique wineries with limited production of high quality wine have a niche in an increasingly sophisticated national market of wine connoisseurs. Facility of travel and the Internet have made wineries all over the nation available to those wishing to visit and buy wine — personally or in a virtual sense. Indeed, a majority in both houses of New York's legislature felt that New York wineries (the vast majority of which are quite small) would benefit from a reciprocity statute that would allow direct sales to consumers by unlicensed out-of-state wineries from states allowing New York wineries the same opportunity. See S. 3533-A, A-7411, 1995 Senate-Assembly Bill (N.Y.1995). The governor chose to veto the bill. See Governor's Veto #76 (N.Y.1995). Changes in marketing techniques or national consumer demand for a product do not alter the meaning of a constitutional amendment. If New York wishes to further relax its regulatory control of the flow of wine into New York, it can do so.
 
 
 45
 We hold that the challenged regulatory scheme is within the ambit of the powers granted to states by the Twenty-first Amendment. New York's regulatory scheme allows licensed wineries, whether in-state or out-of-state, direct access to a market of sophisticated oenophiles. The scheme does so in a non-discriminatory manner, while targeting valid state interests in controlling the importation and transportation of alcohol. Accordingly, we conclude that New York has acted within its authority under the Twenty-first Amendment.
 
 
 46
 II. CONSTITUTIONALITY OF THE REGULATORY SCHEME UNDER THE PRIVILEGES AND IMMUNITIES CLAUSE
 
 
 47
 Plaintiffs-appellees also argue New York's statutory scheme violates the Privileges and Immunities Clause, which provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1. For purposes of this clause, "the terms `citizen' and `resident' are used interchangeably." Supreme Court of New Hampshire v. Piper, 470 U.S. 274, 279 n. 6, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985). As we have discussed above, the statutory scheme operates without regard to residency and does not provide New York residents with advantages unavailable to nonresidents. Cf. Supreme Court of Virginia v. Friedman, 487 U.S. 59, 70, 108 S.Ct. 2260, 101 L.Ed.2d 56 (1988) (invalidating a Virginia Supreme Court rule permitting Virginia residents entrance to the state bar without an examination). Accordingly, we find that the regulatory scheme does not violate the Privileges and Immunities Clause.[14]
 
 
 48
 III. CONSTITUTIONALITY OF SECTION 102(1)(A) UNDER THE FIRST AMENDMENT
 
 
 49
 Finally, plaintiffs-appellees challenge the constitutionality of section 102(1)(a), which provides:
 
 
 50
 No person shall send or cause to be sent into the state any ... publication of any kind containing an advertisement or a solicitation of any order for any alcoholic beverages, irrespective of whether the purchase is made or to be made within or without the state, or whether intended for commercial or personal use or otherwise, unless such person shall be duly licensed.
 
 
 51
 N.Y. Alco. Bev. Cont. Law § 102(1)(a) (McKinney 2000) (emphasis added). In the district court, plaintiffs-appellees argued that section 102(1)(a) was unconstitutionally overbroad in violation of the First Amendment. The district court agreed, but only after deciding that sections 102(1)(c) and (d) were unconstitutional. See Swedenburg, 232 F.Supp.2d at 152. On appeal, plaintiffs-appellees maintain that this section is unconstitutionally overbroad, independent of the constitutional status of sections 102(1)(c) and (d). We agree with plaintiffs-appellees that the statute is overbroad and violates the First Amendment.
 
 
 52
 It is well established that states may prohibit commercial speech concerning unlawful activity. See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 563-64, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). If, however, commercial speech concerns lawful activity and is not misleading, courts must then look to whether there is a substantial governmental interest in prohibiting the commercial speech at issue. Id. at 566, 100 S.Ct. 2343. If the government has identified a substantial interest in regulating the speech, courts "must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." Id. The state "carries the burden of showing that the challenged regulation advances [its] interest in a direct and material way." Rubin v. Coors Brewing Co., 514 U.S. 476, 487, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995) (internal quotation marks and citation omitted).
 
 
 53
 New York contends that the SLA interprets section 102(1)(a) narrowly to prohibit only unlawful activity — "the unlawful solicitation of orders for direct shipments of alcohol to New York residents by unlicensed producers or sellers." In so doing, the State argues, SLA's interpretation prohibits only the advertising of unlawful activity, and thus does not run afoul of the First Amendment.
 
 
 54
 An agency's interpretation of a statute it is charged to administer deserves broad deference when the interpretation has been adopted in a rule-making or other formal proceeding. See Christensen v. Harris County, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Here, however, the State relies only on an affidavit submitted in this litigation as an expression of the agency's view. This Court has held that an opinion letter or a position taken in the course of litigation is entitled to deference only to the extent that it is persuasive. Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York, 273 F.3d 481, 491 (2d Cir.2001). Here, we find the State's affidavit unpersuasive.
 
 
 55
 Section 102(1)(a) plainly encompasses a broader prohibition than the solicitation of orders by unlicensed, out-of-state wineries for direct shipment of wine to New York consumers. The statute's broad language prohibits unlicensed persons from causing any publication to enter the state that contains an "advertisement or a solicitation of any order for any alcoholic beverages." N.Y. Alco. Bev. Cont. Law § 102(1)(a) (McKinney 2000). While the state can limit illegal sales of alcohol, section 102(1)(a) broadly encompasses protected speech. For example, if plaintiffs-appellees' wineries advertised on the Internet and included an order form that is lawful in their own states, the advertisement would be illegal in New York, even if it contained language limiting sales to states in which such orders were lawful. Under the broad terms of section 102(1)(a), the limitation would be insufficient, as the statute prohibits any advertising activity by unlicensed wineries.
 
 
 56
 The State's efforts to defend section 102(1)(a) on the ground that it is narrowly interpreted are unavailing.[15] "[T]he Twenty-first Amendment does not qualify the constitutional prohibition against laws abridging the freedom of speech embodied in the First Amendment." 44 Liquormart, 517 U.S. at 516, 116 S.Ct. 1495. Accordingly, we hold that, in impermissibly regulating protected commercial speech, section 102(1)(a) is overbroad and impermissibly violates the First Amendment.
 
 CONCLUSION
 
 57
 The district court's order of December 12, 2002, is hereby AFFIRMED in part and REVERSED in part and the matter remanded for further proceedings in accordance with this opinion.
 
 
 
 Notes:
 
 
 [1]
 There are exceptions for alcoholic beverages purchased for personal use while outside the United States for at least forty-eight consecutive hoursSee N.Y. Alco. Bev. Cont. Law § 102(1)(c) (McKinney 2000).
 
 
 [2]
 Smaller New York wineries can obtain a farm winery license at a lower fee. N.Y. Alco. Bev. Cont. Law § 76-a (McKinney 2000). A licensed farm winery can manufacture no more than 150,000 finished gallons of wine annually,id. § 76-a(7), and must use New York-grown grapes or other fruits in the manufacturing process. Id. § 76-a(5). Like other licensed wineries, a licensed farm winery may sell and ship its wine to a licensed winery, wholesaler or retailer, or directly to consumers. Id. §§ 76-a(3), (6)(d).
 
 
 [3]
 See Fla. Stat. ch. 561.221 (2003); N.C. Gen. Stat. § 18B-102.1 (2003); Tex. Alco. Bev. Code Ann. § 107.07 (2003); see also Heald v. Engler, 342 F.3d 517, 521 (6th Cir.2003) ("[R]eading a number of provisions in conjunction with each other ... at present, there is no procedure [in Michigan] whereby an out-of-state retailer or winery can obtain a license or approval to deliver wine directly to Michigan residents.") (internal quotation marks omitted).
 
 
 [4]
 In light of its decision on the Commerce Clause claim, the court found it unnecessary to reach appellees' Privileges and Immunities Clause claimId. at 152.
 
 
 [5]
 State-defendants argued the appropriate remedy was to strike the provisions that allow licensed wineries to sell directly to consumersCf. Beskind v. Easley, 325 F.3d 506, 517-20 (4th Cir.2003).
 
 
 [6]
 See Heald v. Engler, 342 F.3d 517 (6th Cir. 2003); Dickerson v. Bailey, 336 F.3d 388 (5th Cir.2003); Beskind v. Easley, 325 F.3d 506 (4th Cir.2003); Bainbridge v. Turner, 311 F.3d 1104 (11th Cir.2002); Bridenbaugh v. Freeman-Wilson, 227 F.3d 848 (7th Cir.2000); see also Mt. Hood Beverage Co. v. Constellation Brands, Inc., 149 Wash.2d 98, 63 P.3d 779 (2003) (considering the constitutionality of a statutory exemption for in-state wineries).
 
 
 [7]
 Although we disagree with the analytical paradigm employed, we need not assess the other circuits' determinations, as the statutes challenged in those cases were significantly different from the regulatory regime at issue here. We note, however, that the Fourth Circuit offered a possible nondiscriminatory alternative to North Carolina's statute that is remarkably similar to the New York schemeSee Beskind, 325 F.3d at 516.
 
 
 [8]
 See, e.g., 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (holding that the Twenty-first Amendment does not grant the states authority to regulate in violation of the First Amendment); Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986) (holding that the Twenty-first Amendment does not confer upon the states authority to regulate alcohol prices in other states); Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984) (holding that the Twenty-first Amendment does not provide states with the authority to regulate to the detriment of the federal interest in maintaining a national marketplace); Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (holding that the Twenty-first Amendment does not grant the states authority to regulate in violation of the Equal Protection Clause); Dep't of Revenue v. James B. Beam Distilling Co., 377 U.S. 341, 84 S.Ct. 1247, 12 L.Ed.2d 362 (1964) (holding that the Twenty-first Amendment does not grant the states power to intrude upon the federal interest in regulating foreign alcohol imports); Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964) (holding that the Twenty-first Amendment does not grant states the authority to intrude upon the federal interest in regulating foreign commerce).
 
 
 [9]
 See, e.g., Heald, 342 F.3d at 522 (finding Michigan's reliance on these cases "disingenuous at best"); Dickerson, 336 F.3d at 406 (relying on more recent Twenty-first Amendment jurisprudence in determining the constitutionality of Texas' regulatory regime); Cooper v. McBeath, 11 F.3d 547, 555 (5th Cir. 1994) (noting that more recent Twenty-first Amendment jurisprudence has confirmed that section 2 does not grant the states plenary authority to regulate alcohol).
 
 
 [10]
 Regrettably,Bacchus is offered as requiring the two-step analysis employed by four of the circuits. See Heald, 342 F.3d at 523-24; Dickerson, 336 F.3d at 400; Beskind, 325 F.3d at 514; Bainbridge, 311 F.3d at 1108. We are hard pressed to find any mandate from the Court directing us to utilize Bacchus as a template in analyzing the New York statute now before us. Bacchus initially analyzed the Hawaiian tax scheme in terms of the dormant Commerce Clause because Hawaii defended the tax as having no effect on interstate commerce. Hawaii did so by arguing that the volume of sales of the two local beverages was exceptionally small. Thus, the state argued its attempt to help some, but not all, local beverages did not hurt sales of other beverages produced in Hawaii or elsewhere. See Bacchus, 468 U.S. at 268-69, 104 S.Ct. 3049. After rejecting that argument, the Court then went on to address an argument Hawaii advanced for the first time at the Court—one based on section 2 of the Twenty-first Amendment. The Court rejected Hawaii's belated effort to save the tax. It noted that the purpose of the tax was to stimulate a local industry, not to regulate the use and distribution of alcohol. See id. at 274-76, 104 S.Ct. 3049. We find nothing in the Supreme Court's opinion that dealt with Hawaii's arguments in seriatim that requires us to transpose the resolution of one case into an analytical model for all.
 
 
 [11]
 Accord, Healy, 491 U.S. at 342, 109 S.Ct. 2491 (noting that section 2 authorizes state regulation of intrastate liquor traffic, and thus does not permit state laws that attempt to prescribe prices for out-of-state liquor sales); Brown-Forman, 476 U.S. at 585, 106 S.Ct. 2080 ("Section 2 of the Twenty-first Amendment... speaks only to state regulation of the transportation or importation into any State... for delivery or use therein of alcoholic beverages.") (internal quotation marks omitted); Bacchus, 468 U.S. at 282, 104 S.Ct. 3049 (noting "we have consistently reaffirmed that understanding of the Amendment, repeatedly acknowledging the broad nature of state authority to regulate commerce in intoxicating liquors"); Midcal, 445 U.S. at 110, 100 S.Ct. 937 (acknowledging that "[t]he Twenty-first Amendment grants the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system" within the state); Capital Cities Cable, Inc., 467 U.S. at 713, 104 S.Ct. 2694 (noting that "the core § 2 power" concerns the regulation of alcohol within the state's borders); James B. Beam Distilling Co., 377 U.S. at 344, 84 S.Ct. 1247 ("[B]y virtue of [section 2 of the Twenty-first Amendment] a State is totally unconfined by traditional Commerce Clause limitations when it restricts the importation of intoxicants destined for use, distribution, or consumption within its borders.") (internal quotation marks omitted); Idlewild, 377 U.S. at 330, 84 S.Ct. 1293 (same).
 
 
 [12]
 Appellees did present some evidence of a general nature with regard to projected costs that an out-of-state winery would incur in obtaining a New York license. They argue those projected costs justify their decision not to pursue a New York license. We find those projections to be of little use, and they are certainly not determinative. Appellees do not contend the requirements for licensing are somehow arbitrary or unrelated to the state's desire to regulate the industry. They simply argue the costs are too high to warrant entry into the market
 
 
 [13]
 The recently enacted Twenty-first Amendment Enforcement Act, while helpful to states, can only be used after a violation occursSee generally 27 U.S.C. § 122a. Under section 2, states have the authority to be proactive as well as reactive.
 
 
 [14]
 Appellees who are New York citizens do not have standing to challenge the regulatory regime under the Privileges and Immunities ClauseSee Zobel v. Williams, 457 U.S. 55, 59 n. 5, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982).
 
 
 [15]
 New York has not argued that it has a substantial interest in limiting advertising of wines in general, or that the prohibition advances any potential interest such as temperance