David D. BACH, Plaintiff–Appellant,

v.

George PATAKI, in his official capacity as Governor of New York, Eliot Spitzer, in his official capacity as Attorney General of New York, James W. McMahon, in his official capacity as Superintendent, New York State Police and Richard Bockelmann, in his official capacity as Ulster County Sheriff, Defendants–Appellees.

Docket No. 03–9123.

United States Court of Appeals, Second Circuit.

Argued: Oct. 1, 2004.

Decided: May 6, 2005.

Kevin J. Miller (David C. Frederick, on the brief) Kellogg, Huber, Hansen, Todd &

Evans, P.L.L.C., Washington, District of Columbia (David D. Bach, Virginia Beach, Virginia, of counsel), for Plaintiff–Appellant.

Frank Brady, Assistant Solicitor General of the State of New York (Eliot Spitzer, Attorney General, on the brief, Daniel Smirlock, Deputy Solicitor General, Nancy A. Spiegel, Senior Assistant Solicitor General, of counsel), Albany, New York, for Defendants–Appellees.

Before: NEWMAN, McLAUGHLIN, and WESLEY, Circuit Judges.

WESLEY, Circuit Judge:

"The powers delegated by the . . . constitution to the federal government[ ] are few and defined. Those which are to remain in the state governments are numerous and indefinite."[1] This case concerns whether the Constitution requires New York to offer handgun licenses to visitors.

## I

David Bach, a Virginia resident and domiciliary, wants to carry his Ruger P–85 9mm pistol while visiting his parents in New York.[2] He has a permit from the Commonwealth of Virginia to carry a concealed weapon. Bach is a model citizen—he holds a Department of Defense top secret security clearance, is a commissioned officer in the United States Naval Reserve, a veteran Navy SEAL, a lawyer employed by the Navy's Office of the General Counsel, a father of three, and, perhaps most laudably, a son who regularly visits his parents in upstate New York.

1. THE FEDERALIST NO. 45 (James Madison).

2. Because Bach's case was dismissed under Federal Rule of Civil Procedure 12(b)(6), we

take the facts as set forth in the complaint. *See Ortiz v. McBride,* 380 F.3d 649, 651 (2d Cir.2004).

"During the ten-hour drive between Virginia and Upstate New York, [his] family and [he] travel on dimly lit rural roads and busy streets and highways[,] some of which are in densely populated areas that have extremely high violent crimes rates."[3] Bach has read "about unarmed, law-abiding citizens being slain by sadistic predators despite the exceptional efforts of law enforcement" and believes that carrying a pistol will help him protect his family.

However, as a nonresident without New York State employment, Bach is not eligible for a New York firearms license. The State Police informed Bach that "no exemption exists which would enable [him] to possess a handgun in New York State" and that "[t]here are no provisions for the issuance of a carry permit, temporary or otherwise, to anyone not a permanent resident of New York State nor does New York State recognize pistol permits issued by other states." The State Police further explained that persons "who maintain seasonal residen[ce] in New York State likewise are not eligible for a New York State Pistol Permit" and warned Bach that if he were found in possession of his pistol in New York he "would be subject to automatic forfeiture of the firearm in question and criminal prosecution."

Bach filed this action against State and local officials to contest his exclusion from New York's licensing scheme. His complaint requests that the district court declare New York's licensing laws unconstitutional, facially and as applied, in violation of both the "right to keep and bear arms" set out in the Second Amendment and the Privileges and Immunities Clause of Article IV of the United States Constitution.

Defendants moved to dismiss, and the district court granted the motion. The court concluded Bach had standing because he "ha[d] made a substantial showing that application for the permit would have been futile." *Bach v. Pataki*, 289 F.Supp.2d 217, 223 (N.D.N.Y.2003) (citing *Jackson–Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir.1997)). The court held that Bach could "prove no set of facts which would entitle him to relief." *Id.* at 229 (citing *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir.1994)). Specifically, the court explained that Bach could allege no constitutional "right to bear arms" because "the Second Amendment is not a source of individual rights," *id.* at 225–26, and that New York's licensing scheme did not violate the Privileges and Immunities Clause of Article IV because "the factor of residence has a substantial and legitimate connection with the purposes of the permit scheme such that the disparate treatment of non-residents is justifiable," *id.* at 228 (citing *People v. Perez*, 67 Misc.2d 911, 912, 325 N.Y.S.2d 183 (Onondaga County Ct.1971)). The court rejected Bach's remaining claims as meritless, *id.* at 228–29, and entered judgment for the State defendants. Bach seeks review of the dismissal of his Second Amendment and Article IV Privileges and Immunities Clause claims. We affirm.

## II

### A

New York State has regulated the possession of weapons since 1849. That year,

---

**3.** Judging from available data, the sooner Bach reaches the New York area, the safer he will be. FBI statistics show that in 2003 the metropolitan areas surrounding and including New York City reported an average violent crime rate of 483.3 per 100,000 inhabitants, compared to rates of 487.1 per 100,000 inhabitants in the greater Washington, DC area, 609.4 per 100,000 in the greater Philadelphia area, and 883.0 per 100,000 in the greater Baltimore area. *See* FBI, CRIME IN THE UNITED STATES 95, 114, 116, 126 (2003).

the State criminalized possession of the "slung shot." [4] *See* 1849 Laws of N.Y., ch. 278, § 2, at 403–04 (repealed 1886). Thirty-five years later, New York instituted a statewide licensing requirement for minors carrying weapons in public, *see* 1884 Laws of N.Y., ch. 46, § 8, at 47,[5] and soon after the turn of the century, the State expanded its licensing requirements to include all persons carrying concealed pistols, *see* 1905 Laws of N.Y., ch. 92, § 2, at 129–30. With the passage of the Sullivan Act in the spring of 1911, New York's licensing requirement applied to all persons possessing pistols or any other firearm small enough to be carried concealed. *See* 1911 Laws of N.Y., ch. 195, § 1, at 443 (codifying N.Y. Penal Law § 1897, ¶ 3).

The State's earliest firearms-licensing statutes delegated licensing to municipalities. *See, e.g.*, 1884 Laws of N.Y., ch. 46, § 8; 1905 Laws of N.Y., ch. 92, § 2, at 242–43; 1908 Laws of N.Y., ch. 93, § 1. When the State first established statewide application requirements, it limited licenses to "have and carry concealed" to those "citizen[s] of and usually a resident in the state of New York," but permitted the licensing official—judges in most parts of the State, but the police commissioner in New York City—to make an exception, so long as the officer received certificates of good moral character regarding the applicant and the official "state[d] in such license the particular reason for the issuance thereof." *See* N.Y. Penal Code § 1897(9) (1927).

In 1963, New York altered its statewide licensing procedures, making two significant and related changes. First, it granted licensing officers the authority to revoke licenses "at any time." *See* 1963 Laws of N.Y., ch. 136, § 8 (codifying N.Y. Penal Code § 1903(11), now § 400.00(11)). Second, it limited carry licensees to New York residents and in-state employees. *Id.* (codifying N.Y. Penal Code § 1903(3), now § 400.00(3)). As explained below, the licensing officers' revocation authority and the residency requirement remain features of the current statutory regime.

## B

Today, New York regulates handguns primarily though Articles 265 and 400 of the Penal Law. Article 265 creates a general ban on handgun possession, *see, e.g.*, N.Y. Penal Law §§ 265.01(1), 265.02(4), with specific exemptions thereto, *see* N.Y. Penal Law § 265.20. The exemption at issue here is a licensed use exemption defined in Article 400: "[the p]ossession of a pistol or revolver by a person to whom a license therefor has been issued." N.Y. Penal Law §§ 265.20(3) (referencing sections 400.00 and 400.01).

Article 400 of the Penal Law "is the exclusive statutory mechanism for the licensing of firearms in New York State." *O'Connor v. Scarpino*, 83 N.Y.2d 919, 920, 615 N.Y.S.2d 305, 638 N.E.2d 950 (1994). Licenses are limited to persons over twenty-one, of good moral character, without a history of crime or mental illness, and "concerning whom no good cause exists for

---

**4.** In late 1840's America, the term "slung shot"—slung being the past participle of sling—described a "shot, piece of metal, stone, etc., fastened to a strap or thong, and used as a weapon." Oxford English Dictionary 759 (2d ed.1989).

**5.** The 1884 law amended section 410 of the Penal Code to provide, in part, "[A]ny person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor."

the denial of the license." N.Y. Penal Law § 400.00(1). There are several types of pistol and revolver licenses, including licenses for household possession, *see* N.Y. Penal Law § 400.00(2)(a), for workplace possession, *see* N.Y. Penal Law § 400.00(2)(b), and to "have and carry concealed," *see* N.Y. Penal Law § 400.00(2)(f). The last, a carry license, may issue only for "proper cause."[6] *Id.*

Licensing is a rigorous and principally local process that begins with the submission of a signed and verified application to a local licensing officer. *See* N.Y. Penal Law § 400.00(3). Applicants must demonstrate compliance with certain statutory eligibility requirements as well as any facts "as may be required to show the good character, competency and integrity of each person or individual signing the application." N.Y. Penal Law § 400.00(3). Every application triggers a local investigation. *See* N.Y. Penal Law § 400.00(4). "[T]he police authority of the city or county where the application is made is responsible for investigating the statements in the application." 1986 N.Y. Op. Atty. Gen. (Inf.) 120, 1986 N.Y. AG LEXIS 26, at*1–*2. Local police, therefore, investigate ap-

plicants' mental health history, criminal history, moral character, and, in the case of a carry license, representations of proper cause. *See* N.Y. Penal Law § 400.00(1)—(4). Police officers also take applicants' fingerprints and check them against the records of the State Division of Criminal Justice Services and the FBI. *See* N.Y. Penal Law § 400.00(4). Upon completion of the investigation, the police authority reports its results to the licensing officer. *See id.*

Local licensing officers, often local judges,[7] have considerable discretion in deciding whether to grant a license application. *See, e.g., Vale v. Eidens,* 290 A.D.2d 612, 735 N.Y.S.2d 650 (3d Dep't 2002); *Kaplan v. Bratton,* 249 A.D.2d 199, 673 N.Y.S.2d 66 (1st Dep't 1998); *Fromson v. Nelson,* 178 A.D.2d 479, 577 N.Y.S.2d 417 (2d Dep't 1991); *Marlow v. Buckley,* 105 A.D.2d 1160, 482 N.Y.S.2d 183 (4th Dep't 1984). The officer may deny an application for any "good cause," *see* N.Y. Penal Law § 400.00(1)(g); *Bando v. Sullivan,* 290 A.D.2d 691, 691–92, 735 N.Y.S.2d 660 (3d Dep't 2002), may deny a carry license for an absence of what the officer deems "proper cause," *see* N.Y. Penal Law

6. New York requires a carry license for the concealed and open carrying of firearms. *See* N.Y. Penal Law §§ 265.01, 265.02, 400.00(2)(d)-(f). This general approach to the concealed and open carrying of firearms is distinct from that of some other States, which have laws specifically addressing the carrying of concealed firearms. *See, e.g.,* Cal.Penal Code § 12025 (defining crime of "carrying a concealed firearm" and explaining that "[f]irearms carried openly in belt holsters are not concealed"); Va.Code Ann. § 18.2–308(A) (defining crime of "carr[ying] about [one's] person, hidden from common observation, ... any pistol"); *see also* N.Y. Joint Legislative Comm. on Firearms & Ammunition, N.Y. Legislative Doc. No. 29 at 13 (N.Y.1962) ("[T]he historic factor of whether the firearm is carried openly or concealed has frequently been decisive. Apparently in only nine

(Conn.D.C., Hawaii, Ind., Mass., N.M., N.Y., Tex., W.Va.) of the forty-five prohibiting jurisdictions does the prohibition extend to openly carried firearms.").

7. " 'Licensing officer' means in the city of New York the police commissioner of that city; in the county of Nassau the commissioner of police of that county; in the county of Suffolk the sheriff of that county except in the towns of Babylon, Brookhaven, Huntington, Islip and Smithtown, the commissioner of police of that county; for the purposes of section 400.01. of this chapter the superintendent of state police; and elsewhere in the state a judge or justice of a court of record having his office in the county of issuance." N.Y. Penal Law § 265.00(10).

§ 400.00(2)(f),[8] and may restrict a carry license "to the purposes that justified the issuance," *O'Connor*, 83 N.Y.2d at 921, 615 N.Y.S.2d 305, 638 N.E.2d 950. Licensing officers can deny applications where they find an applicant's personal background troubling. *See, e.g., Vale*, 290 A.D.2d at 613, 735 N.Y.S.2d 650; *Fromson*, 178 A.D.2d at 479, 577 N.Y.S.2d 417. A licensing officer may also deny a carry license for lack of "proper cause" if, *inter alia*, the applicant does not "sufficiently demonstrate a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession." *Williams v. Bratton*, 238 A.D.2d 269, 270, 656 N.Y.S.2d 626 (1st Dep't 1997) (quoting *Klenosky v. New York City Police Dep't*, 75 A.D.2d 793, 428 N.Y.S.2d 256 (1st Dep't 1980), *aff'd* 53 N.Y.2d 685, 439 N.Y.S.2d 108, 421 N.E.2d 503 (1981)); *see also Bando*, 290 A.D.2d at 693, 735 N.Y.S.2d 660. A licensing officer's decision will not be disturbed unless it is arbitrary and capricious. *See O'Brien v. Keegan*, 87 N.Y.2d 436, 439–40, 639 N.Y.S.2d 1004, 663 N.E.2d 316 (1996); *see also Bando*, 290 A.D.2d. at 692, 735 N.Y.S.2d 660.[9]

A licensing officer is also "statutorily invested with the power to *sua sponte* revoke or cancel a license." *O'Brien*, 87 N.Y.2d at 439, 639 N.Y.S.2d 1004, 663 N.E.2d 316 (1996) (citing N.Y. Penal Law § 400.00(11)).[10] He enjoys wide discretion in exercising this "extraordinary power," *O'Brien*, 87 N.Y.2d at 439, 639 N.Y.S.2d 1004, 663 N.E.2d 316; *see, e.g., Gerard v. Czajka*, 307 A.D.2d 633, 762 N.Y.S.2d 533 (3d Dep't 2003); *Biganini v. Gallagher*, 293 A.D.2d 603, 742 N.Y.S.2d 73 (2d Dep't 2002), which may be exercised at "any time," N.Y. Penal Law § 400.00(11), and includes the prerogative "to monitor carry licenses he has issued to ensure that the basis for issuance of the license remains," 1991 N.Y. Op. Atty. Gen. (Inf.) 72, 1991 N.Y. AG LEXIS 84, *3.

An officer's revocation decision may be triggered by local incidents;[11] in light of

---

8. Licensing officers have great discretion in defining a "proper cause" threshold. For instance, the New York Court of Appeals left undisturbed a licensing officer's conclusion that good moral character plus a desire to carry a weapon would not alone establish "proper cause." *See Moore v. Gallup*, 293 N.Y. 846, 59 N.E.2d 439 (1944) (per curiam), *aff'g* 267 A.D. 64, 66, 45 N.Y.S.2d 63 (3d Dep't 1943) (upholding licensing officer's determination that "a dangerous and unwise precedent would be established if all citizens of good moral character were to be licensed to carry pistols upon a simple showing of a desire ... to engage in unregulated and unsupervised target practice"). In New York City, "the mere fact that an applicant has been the victim of a crime or resides in or is employed in a 'high crime area,' does not establish 'proper cause' for the issuance of a carry ... license." 38 New York City Rules and Regulations § 5–03 (example); *see Theurer v. Safir*, 254 A.D.2d 89, 90, 680 N.Y.S.2d 87 (1st Dep't 1998).

9. Licensing officers exercise such great discretion in denying carry licenses that one commentator has argued that the licensing system might violate the New York State Constitution. *See* Suzanne Novak, *Why The New York State System For Obtaining A License To Carry A Concealed Weapon Is Unconstitutional*, 26 FORDHAM URB. L.J. 121, 165–66 (1998). (arguing that "[t]he sole 'proper cause' standard for the issuance of a carry license is the equivalent of a standardless delegation, which, in effect, grants ... officials the discretion to apply their own public policy on gun control").

10. "Other than in New York City and Nassau and Suffolk Counties, a Judge or Justice of a court of record acts as the licensing officer" for revocation purposes pursuant to section 400.00(11). *O'Brien*, 87 N.Y.2d at 439, 639 N.Y.S.2d 1004, 663 N.E.2d 316.

11. New York law provides for the transfer of a licensee's records to any new place of resi-

the highly destructive potential of a firearm, local officials may revoke a license if a licensee engages in behavior that portends of future problems. Thus, where a licensee told fellow graduate students that he was "one step away from Smith & Wesson time," *Gerard*, 307 A.D.2d at 633, 762 N.Y.S.2d 533, the local police department's report of the incident caused the licensing officer to revoke the license, *id.* at 633–34, 762 N.Y.S.2d 533. In another instance, a licensing officer revoked a license after local law enforcement reported that the licensee had appeared in an "agitated state while in possession of a loaded pistol when the officer responded to a report of poachers on [the licensee's] property." *Finley v. Nicandri*, 272 A.D.2d 831, 831, 708 N.Y.S.2d 190 (3d Dep't 2000).[12] Local incidents may also lead a licensing officer to conclude that a licensee lacks the mental fitness to continue to possess a firearm and to revoke the license on that basis. *See Harris v. Codd*, 57 A.D.2d 778, 394 N.Y.S.2d 210 (1st Dep't 1977).

Licensing is thus a locally controlled process. The only nonresidents eligible for a license are local workers, who may apply to the licensing officer in the city or county of their principal employment or principal place of business. *See* N.Y. Penal Law § 400.00(3)(a). Section 400.00(3)(a) provides:

> Applications shall be made and renewed, in the case of a license to carry or possess a pistol or revolver, to the licensing officer in the city or county, as the case may be, where the applicant resides, is principally employed or has his principal place of business as merchant or storekeeper . . . .

*Id.* The statute does not provide a mechanism for any other nonresident applications. One New York appellate court has explained that nonresident applications would be inconsistent with "the purposes underlying the pistol permit procedures, namely, to insure that only persons of acceptable background and character are permitted to carry handguns and to provide a method for reporting information on the identity of persons possessing weapons and the weapons themselves . . . ." *Mahoney v. Lewis*, 199 A.D.2d 734, 735, 605 N.Y.S.2d 168 (3d Dep't 1993). Nonresidents without in-state employment are completely excluded from the license-application procedure.[13]

Some classes of nonresidents may nonetheless possess or carry handguns in New York. Although New York generally "does not recognize or give effect to licenses to carry firearms issued by . . . other state[s]," 1997 N.Y. Op. Atty. Gen. 14, federal law grants a limited right to trans-

---

dence within the State. *See* N.Y. Penal Law § 400.00(5); *see also* 1978 N.Y. Op. Atty. Gen. (Inf.) 83, 1978 N.Y. AG LEXIS 199 (concluding that original records, not copies, should be transferred).

**12.** Likewise, Paul Lang had his license revoked where he "showed poor judgment by failing to safeguard his weapon while accompanying a Boy Scout troop," *Lang v. Rozzi*, 205 A.D.2d 783, 783, 614 N.Y.S.2d 41 (2d Dep't 1994), Abraham Ehrlich's license was revoked after carrying his pistol in a social setting while intoxicated, *see In re Ehrlich*, 99 A.D.2d 545, 545, 471 N.Y.S.2d 628 (2d Dep't 1984), and Mikhail Zalmanov lost his license

after failing to safeguard his gun, carrying it with him after work while socializing, and displaying it in a threatening manner, *see Zalmanov v. Bratton*, 240 A.D.2d 173, 173, 657 N.Y.S.2d 691 (1st Dep't 1997).

**13.** New York courts have limited resident applications to persons who are New York domiciliaries. *See id.* (rejecting application of a New York property owner with his principal residence in Toms River, New Jersey); *cf. In re Davies*, 133 Misc.2d 38, 41, 506 N.Y.S.2d 626 (Oswego County Ct.1986) (limiting application to locality "where the applicant maintains his or her permanent or principal home").

port unloaded firearms through the State.[14] Additionally, Article 265 sets forth a number of provisions permitting nonresidents to possess or carry firearms. For instance, police officers of other States may possess pistols while conducting official business in New York, *see* N.Y. Penal Law § 265.20(a)(11), and nonresidents licensed within their own States may use pistols in competitive shooting matches in New York, *see* N.Y. Penal Law § 265.20(a)(13). These exemptions exist apart from the licensing exemption.

## III

■ Bach never applied for a New York handgun license, and, before the district court, defendants contended that Bach's claims were not justiciable because Bach accordingly lacked "standing."[15] *See Bach,* 289 F.Supp.2d at 223. The district court rejected this argument. *See id.* Defendants do not renew that challenge on appeal, but, as it concerns the subject matter jurisdiction of the district court, we consider it in any event. *See FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 230–

31, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *see also Pashaian v. Eccelston Props., Ltd.,* 88 F.3d 77, 82 (2d Cir.1996); *Petereit v. S.B. Thomas, Inc.,* 63 F.3d 1169, 1175 (2d Cir.1995). We hold that Bach's failure to file a license application does not pose an obstacle to consideration of his claims.

The district court correctly noted that " '[i]n many cases, requiring litigants to actually apply for a license before challenging a licensing scheme prevent[s] courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements ....' " *Bach,* 289 F.Supp.2d at 223 (quoting *Sammon v. New Jersey Bd. of Med. Exam'rs,* 66 F.3d 639, 643 (3d Cir.1995)); *see also Prayze FM v. FCC,* 214 F.3d 245, 251 (2d Cir. 2000). The district court concluded that imposing an application requirement here, however, "would serve no purpose." *Bach,* 289 F.Supp.2d at 223 (quoting *Sammon,* 66 F.3d at 643). We agree.

The State Police informed Bach that he was statutorily ineligible for a carry license.[16] Bach had nothing to gain thereaf-

---

**14.** 18 U.S.C. § 926A provides: "Notwithstanding any other provision of any law or any rule or regulation of a State or any political subdivision thereof, any person who is not otherwise prohibited by this chapter from transporting, shipping, or receiving a firearm shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm if, during such transportation the firearm is unloaded, and neither the firearm nor any ammunition being transported is readily accessible or is directly accessible from the passenger compartment of such transporting vehicle: *Provided,* That in the case of a vehicle without a compartment separate from the driver's compartment the firearm or ammunition shall be contained in a locked container other than the glove compartment or console."

**15.** Defendants' "standing" objection might also be understood as a ripeness challenge.

*See Brennan v. Nassau County,* 352 F.3d 60, 65 (2d Cir.2003); *Berger v. Heckler,* 771 F.2d 1556, 1562 n. 8 (2d Cir.1985); *see also* ERWIN CHEMERINSKY, FEDERAL JURISDICTION (4th ed.) § 2.4, at 114 ("[S]tanding focuses on whether the type of injury alleged is qualitatively sufficient to fulfill the requirements of Article III and whether the plaintiff has personally suffered that harm, whereas ripeness centers on whether that injury has occurred yet.").

**16.** The Office of the Attorney General of the State of New York directed Bach to contact the State Police with his inquiry. Bach also contacted the Ulster County Sheriff's Office, and Undersheriff George A. Wood informed him that he would not fit into the exemption for "[p]ersons in the military or other service of the United States, in pursuit of official duty or when duly authorized by federal law, regulation or order to possess the same." N.Y. Penal Law § 265.20(1)(d).

ter by completing and filing an application. *See Desiderio v. NASD*, 191 F.3d 198, 202 (2d Cir.1999). New York law provides only for application to the licensing officer "where the applicant resides, is principally employed, or has his principal place of business," *see* N.Y. Penal Law § 400.00(3)(a); Bach is neither a New York resident nor worker. Imposing a filing requirement would force Bach to complete an application for which he is statutorily ineligible and to file it with an officer without authority to review it. "We will not require such a futile gesture as a prerequisite for adjudication in federal court." *Williams v. Lambert*, 46 F.3d 1275, 1280 (2d Cir.1995); *see also Sammon*, 66 F.3d at 643. Bach's claims are thus justiciable.

## IV

Bach argues that New York's licensing scheme unreasonably infringes upon his "right to keep and bear arms" under the Second Amendment, which provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. He contends that the Second Amendment's right to keep and bear arms is a right of individual citizens, that it limits the States in regulating firearms, and that New York's statutory scheme cannot withstand the resultant heightened scrutiny.

Bach focuses primarily on the question of whether the right to keep and bear arms is an individual right.[17] Applying textualist and originalist approaches to interpreting the Amendment, proffering historical and contemporary scholarship, and buttressed by the recent conclusions of both the Fifth Circuit and the Department of Justice, Bach asks this Court to declare the "right to keep and bear arms" an individual, rather than collective, right.[18] Defendants, by contrast, construe the Amendment as merely a "guarantee[ ] to the states [of] the collective right to arm or fortify their respective 'well regulated' militias" and insist that the Amendment "does not establish an individual right to 'bear arms' for any purpose." They respond to Bach's arguments in kind, offering their own textualist and originalist analyses, relying on their own set of Second Amendment scholarship, and citing decisions of our sister circuits rejecting the individual rights interpretation.[19] The district court found the defendants' arguments more persuasive and concluded that Bach had "not alleged an infringement of any Second Amendment right" because "the Second Amendment is not a source of

---

**17.** For a review of various contemporary approaches to this question, see Michael Busch, *Is the Second Amendment an Individual or Collective Right: United States v. Emerson's Revolutionary Interpretation of the Right to Bear Arms*, 77 St. John's L. Rev. 345 (2003).

**18.** Bach cites scholarship ranging from Thomas M. Cooley, The General Principles of Constitutional Law in the United States of America 298–99 (Andrew C. McLaughlin ed., 1898) (1880) to Eugene Volokh, *The Commonplace Second Amendment*, 73 N.Y.U. L. Rev. 793 (1998). His position reflects the opinion of the Fifth Circuit dicta in *United States v. Emerson*, 270 F.3d 203, 264 (5th Cir.2001), and of the Department of Justice's Office of Legal

Counsel in its opinion, Whether the Second Amendment Secures an Individual Right, Op. Off. Legal Counsel, 2004 WL 2930974.

**19.** Defendants' citations include Jack N. Rakove, *The Second Amendment: The Highest State of Originalism*, 76 Chi.-Kent L. Rev. 103 (2000), and Paul Finkelman, *"A Well Regulated Militia": The Second Amendment in Historical Perspective*, 76 Chi.-Kent L. Rev. 195 (2000). Various circuit courts share defendants' conclusion. *See, e.g., Nordyke v. King*, 319 F.3d 1185, 1191–92 & n. 4 (9th Cir.2003); *United States v. Parker*, 362 F.3d 1279, 1282 (10th Cir.2004).

individual rights." *Bach*, 289 F.Supp.2d at 226.

■ Although the sweep of the Second Amendment has become the focus of a national legal dialogue, we see no need to enter into that debate.[20] Instead, we hold that the Second Amendment's "right to keep and bear arms" imposes a limitation on only federal, not state, legislative ef-

forts.[21] We thus join five of our sister circuits.[22]

Our holding is compelled by the Supreme Court's opinion in *Presser v. Illinois*, 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615 (1886). In 1879, Herman Presser led four hundred armed members of a society called the *Lehr und Wehr Verein* through the streets of Chicago. *Id.* at 253–55, 6

**20.** *Cf. Emerson*, 270 F.3d at 272 (Parker, J., concurring) ("The determination whether rights bestowed by the Second Amendment are collective or individual is entirely unnecessary to resolve this case and has no bearing on the judgment we dictate by this opinion.").

**21.** The district court recognized that defendants raised this argument, but it declined to address it. *Bach*, 289 F.Supp.2d at 225, n. 4.

**22.** *See Thomas v. Members of the City Council of Portland*, 730 F.2d 41, 42 (1st Cir.1984) (per curiam); *Cases v. United States*, 131 F.2d 916, 921 (1st Cir.1942) ("[T]he only function of the Second Amendment [is] to prevent the federal government and the federal government only from infringing that right."); *Love v. Pepersack*, 47 F.3d 120, 123 (4th Cir.1995) ("The Second Amendment does not apply to the states."); *Edwards v. City of Goldsboro*, 178 F.3d 231, 232 (4th Cir.1999) ("[T]he law is settled in our circuit that the Second Amendment does not apply to the States."); *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 539 n. 18 (6th Cir.1998) ("The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment does not incorporate the Second Amendment; hence, the restrictions of the Second Amendment operate only upon the Federal Government."); *Quilici v. Village of Morton Grove*, 695 F.2d 261, 270 (7th Cir.1982) ("[T]he second amendment does not apply to the states."); *Fresno Rifle and Pistol Club, Inc. v. Van De Kamp*, 965 F.2d 723, 731 (9th Cir. 1992) ("[T]he Second Amendment limits only federal action, and we affirm the district court's decision 'that the Second Amendment stays the hand of the National Government only.'"); *see also Hamilton v. Accu-tek*, 935 F.Supp. 1307, 1318 (E.D.N.Y.1996) ("[T]he Second Amendment limits only the power of Congress."). *Cf. United States v. Tot*, 131 F.2d 261, 266 (3d Cir.1942) ("It is abundantly clear ...that this amendment [was adopted]

...as a protection for the States in the maintenance of their militia organizations against possible encroachments by the federal power."), *rev'd on other grounds*, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943); *Eckert v. City of Philadelphia*, 477 F.2d 610, 610 (3d Cir.1973) (per curiam); *United States v. Nelsen*, 859 F.2d 1318, 1320 (8th Cir.1988); *United States v. Parker*, 362 F.3d 1279 (10th Cir.2004). *But see United States v. Emerson*, 270 F.3d 203, 221 n. 13 (5th Cir.2001).

The New York courts also share our conclusion. They have repeatedly held that the Second Amendment is inapplicable to the State's regulation of handguns. *See Moore v. Gallup*, 293 N.Y. 846, 59 N.E.2d 439 (1944) (per curiam), *aff'g* 267 A.D. 64, 67, 45 N.Y.S.2d 63 (3d Dep't 1943) ("Obviously, petitioner cannot rest his case upon the Second Amendment which is a limitation upon the exertion of the power of Congress and the national government, but not upon that of the State."); *Demyan v. Monroe*, 108 A.D.2d 1004, 1005, 485 N.Y.S.2d 152 (3d Dep't 1985) ("The constitutional argument, namely, that Penal Law § 400.00 infringes on petitioner's rights guaranteed by the U.S. Constitution, 2d Amendment to keep and bear arms, has already received considerable judicial attention and has consistently been repudiated."); *People ex rel. Darling v. Warden of the City Prison of New York*, 154 A.D. 413, 419–20, 139 N.Y.S. 277 (1st Dep't 1913) (citing *People v. Persce*, 204 N.Y. 397, 403, 97 N.E. 877 (1912) ("The provision in the Constitution of the United States that 'the right of the people to keep and bear arms shall not be infringed' is not designed to control legislation by the State.")). *Cf. Brown v. City of Chicago*, 42 Ill.2d 501, 504, 250 N.E.2d 129, 131 (1969) ("[R]egulation which does not impair the maintenance of the State's active, organized militia is not in violation of either the terms or the purposes of the second amendment.")

S.Ct. 580. Illinois's Military Code required that any "parade with arms" be licensed by the Governor. *Id.* Presser lacked a license, and was charged and convicted under the Code. *Id.* Presser argued to the Supreme Court that Illinois had exercised a power "forbidden to the States by the Constitution of the United States." *Id.* at 260, 6 S.Ct. 580. He relied on both the Second and Fourteenth Amendments. *See id.* at 257, 260–61, 6 S.Ct. 580.

The Supreme Court rejected Presser's argument. Justice Woods explained, "[A] conclusive answer to the contention that [the Second Amendment] prohibits the legislation in question lies in the fact that the amendment is a limitation only upon the power of Congress and the National government, and not upon that of the States." *Id.* at 265, 6 S.Ct. 580. The Court quoted Chief Justice Waite's opinion in *United States v. Cruikshank*, 92 U.S. 542, 23 L.Ed. 588 (1875). "[T]he right of the people to keep and bear arms 'is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The Second Amendment declares that is shall not be infringed, but this, as has been seen, means no more than that it shall not be infringed by Congress.'" *Presser*, 116 U.S. at 265, 6 S.Ct. 580 (quoting *Cruikshank*, 92 U.S. at 553).[23] The Court affirmed Presser's conviction. *Id.* at 269.

*Presser* stands for the proposition that the right of the people to keep and bear arms, whatever else its nature, is a right only against the federal government, not against the States. The courts are uniform in this interpretation. *See, e.g., Thomas*, 730 F.2d at 42 (1st Cir.); *Peoples Rights Org.*, 152 F.3d at 538–39 n. 18 (6th Cir.); *Quilici*, 695 F.2d at 269 (7th Cir.); *Fresno Rifle & Pistol Club*, 965 F.2d at 730–31 (9th Cir.). Just as Presser had no federal constitutional right "to keep and bear arms" with which to challenge Illinois's license requirement, Bach has none to assert against New York's regulatory scheme. Under *Presser*, the right to keep and bear arms is not a limitation on the power of States.

Bach does not distinguish *Presser*. Rather, he contends that *Presser* is "outdated" and "do[es] not reflect the Court's modern view." He relies on two footnotes for support—the Fifth Circuit's comment in *United States v. Emerson* that *Presser* "came well before the Supreme Court began the process of incorporating certain provisions of the first eight amendments

---

**23.** The *Presser* court extended *Cruikshank* in an important way. In *Cruikshank*, the Supreme Court considered whether section six of the Enforcement Act, 16 Stat. 140, 141 (1870), prohibited individuals from conspiring to prevent the exercise of the "right to keep and bear arms for a lawful purpose." 92 U.S. at 545–49, 553. Section six applied, by its terms, to persons conspiring "to injure, oppress, threaten or intimidate any citizen with intent to prevent or hinder his exercise and enjoyment of any right or privilege granted or secured to him by the constitution or laws of the United States." 16 Stat. at 141; *see Cruikshank*, 92 U.S. at 548. The Court found that the right to bear arms was "not a right granted by the Constitution" or "in any manner dependent upon that instrument for its existence," *id.* at 553, and, with regard to the Second Amendment explained, "This is one of the amendments that has no other effect than to restrict the powers of the national government, leaving the people to look for their protection against any violation by their fellow-citizens of the rights it recognizes . . .," *id.* at 553. The *Cruikshank* court thus held that section six of the Enforcement Act could not criminalize conspiracies interfering with any "right to bear arms." *Id.* at 553. In so doing, the *Cruikshank* court held that it was improper to apply any limitations of the Second Amendment, whatever those might be, against individuals. *Id. Presser*, using the language of *Cruikshank*, went further: it refused to apply any limitations of the Second Amendment against the States.

into the Due Process Clause of the Fourteenth Amendment," 270 F.3d at 221 n. 13, and the Ninth Circuit's similar note in *Silveira v. Lockyer* that "*Presser* rest[s] on a principle that is now thoroughly discredited," 312 F.3d 1052, 1066 n. 17 (9th Cir. 2002). Bach contends that *Presser* should not and cannot bind our determination of whether the Second Amendment applies to the States. We disagree.

■ We must follow *Presser*. Where, as here, a Supreme Court precedent "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to th[e Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); *see also id.* at 486, 109 S.Ct. 1917 (Stevens, J., dissenting). The Court has cautioned, in the context of constitutional interpretation, that "courts should [not] conclude [that] more recent [Supreme Court] cases have, by implication, overruled an earlier precedent." *Agostini v. Felton*, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); *see also id.* at 258, 117 S.Ct. 1997

(Ginsburg, J., dissenting). Even if a Supreme Court precedent was " 'unsound when decided' " and even if it over time becomes so " 'inconsistent with later decisions' " as to stand upon " 'increasingly wobbly, moth-eaten foundations,' " it remains the Supreme Court's "prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 9, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (quoting *Khan v. State Oil Co.*, 93 F.3d 1358, 1363 (7th Cir.1996) (Posner, J.)). Thus, "regardless of whether appellant[ ] agree[s] with the *Presser* analysis, it is the law of the land and we are bound by it. The[ ] assertion that *Presser* is illogical is a policy matter for the Supreme Court to address." *Quilici*, 695 F.2d at 270. We cannot overrule the Supreme Court.[24]

Accordingly, we hold that the "right to keep and bear arms" does not apply against the States and affirm the district court's dismissal of Bach's Second Amendment claim.

## V

Bach also challenges New York's licensing regime under the Privileges and Immunities Clause of Article IV, section two of the Constitution. He contends that

---

**24.** Bach cites this Court's incorporation of the Third Amendment in *Engblom v. Carey*, 677 F.2d 957 (2d Cir.1982), as support for the proposition that this Court may incorporate rights against the States without waiting for a "Supreme Court decision explicitly" doing so. *Engblom* is not relevant to the question before us, which is not whether this Court can incorporate rights in the absence of a Supreme Court precedent doing so—our precedents in *Engblom* and *United States v. Wilkins*, 348 F.2d 844 (2d Cir.1965), suggest that we can— but, rather, whether this Court can overrule the Supreme Court. The Supreme Court answered that question in the negative in *Shearson/American Express* and *Agostini*.

Notably, in *Wilkins*, this Court incorporated the Double Jeopardy Clause over a dissent that complained that "the incorporation of

guarantees of the Bill of Rights into the Due Process Clause of the Fourteenth Amendment at the expense of departing from several long-standing Supreme Court decisions is a step which should only be taken by that Court." 348 F.2d at 868 (Metzner, J., dissenting). *Wilkins*, however, came two decades before the Supreme Court's "firm instruction" in *Shearson/American Express*. *Agostini*, 521 U.S. at 258, 117 S.Ct. 1997 (Ginsburg, J., dissenting). As Justice Ginsburg explained, before *Shearson/American Express*, "lower courts sometimes inquired whether an earlier ruling of th[e Supreme] Court had been eroded to the point that it was no longer good law." *Id.* "*Shearson/American Express* now controls, however, so . . . [this Court has] no choice" but to follow *Presser*. *Id.*

"New York's prohibition on allowing non-residents such as Bach to obtain a firearms license violates the Privileges and Immunities Clause."

Bach suggests that New York's licensing scheme unconstitutionally discriminates against both his protected rights under the Privileges and Immunities Clause and the "right to travel" secured therein. But the "right to travel," at least in this context, is simply a shorthand for the protections of the Privileges and Immunities Clause of Article IV, as travel—movement from one State to another—is at the core of every Privileges and Immunities Clause challenge. As the Supreme Court has explained, the "right to travel," in the constitutional context, "embraces at least three different components." *Saenz v. Roe*, 526 U.S. 489, 500, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999). Two of those components, " 'the right of free ingress and regress to and from' neighboring states," *id.* at 500–01, 119 S.Ct. 1518 (quoting *United States v. Guest*, 383 U.S. 745, 758, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966)), and "the right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State," *id.* at 502–04, 119 S.Ct. 1518, are inapplicable here. The third and only relevant component is merely a restatement of rights arising under Article IV—"the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in [a] second State." *Id.* at 501, 119 S.Ct. 1518. Bach's appeal depends on only this last

guarantee that, "by virtue of a person's state citizenship, a citizen of one State who travels in other States, intending to return home at the end of his journey, is entitled to enjoy the 'Privileges and Immunities of Citizens in the several States' that he visits." *Id.* at 501, 119 S.Ct. 1518. His appeal thus condenses to the challenge that New York's handgun licensing scheme unconstitutionally discriminates against non-residents with regard to a protected privilege under the Clause.

Because we hold that New York's interest in monitoring gun licensees is substantial and that New York's restriction of licenses to residents and persons working primarily within the State is sufficiently related to this interest, we reject Bach's Article IV Privileges and Immunities Clause challenge.

**A**

The Privileges and Immunities Clause provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. CONST. art. IV, § 2. This clause, like the Commerce Clause of Article I, section 8, derives from the fourth of the Articles of Confederation,[25] *see Austin v. New Hampshire*, 420 U.S. 656, 660–61, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975); *Hicklin v. Orbeck*, 437 U.S. 518, 531–32, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978); *Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 94 (2d Cir.2003), and had the primary purpose of

---

**25.** That article provided, "The better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free inhabitants of each of these States, paupers, vagabonds and fugitives from justice excepted, shall be entitled to all privileges and immunities of free citizens in the several States; and the people of each State shall have free ingress and regress to and from any other State, and shall enjoy therein all the privileges of trade and

commerce, subject to the same duties, impositions and restrictions as to the inhabitants thereof respectively." *Austin v. New Hampshire*, 420 U.S. 656, 660, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975). "[This] provision was carried over into the comity article [Article IV] of the Constitution in briefer form but with no change of substance or intent, unless it was to strengthen the force of the clause in fashioning a single nation." *Id.* at 661 & n. 6, 95 S.Ct. 1191.

"fus[ing] into one Nation a collection of independent, sovereign States," *Toomer v. Witsell*, 334 U.S. 385, 395, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948); *see also Supreme Court of Virginia v. Friedman*, 487 U.S. 59, 64, 108 S.Ct. 2260, 101 L.Ed.2d 56 (1988). "It was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy." *Toomer*, 334 U.S. at 395, 68 S.Ct. 1156. It operates to "place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned." *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 180, 19 L.Ed. 357 (1869), *quoted in Friedman*, 487 U.S. at 64, 108 S.Ct. 2260. Indeed, "[t]he Privileges and Immunities Clause, by making noncitizenship or nonresidence an improper basis for locating a special burden, implicates not only the individual's right to nondiscriminatory treatment but also, perhaps more so, the structural balance essential to the concept of federalism." [26] *Austin*, 420 U.S. at 662, 95 S.Ct. 1191 (footnote omitted).

██ In order to prevail on a Privileges and Immunities challenge, a plaintiff must demonstrate that the "State has, in fact, discriminated against out-of-staters with regard to the privileges and immunities it accords its own citizens." *Crotty*, 346 F.3d at 94. The challenged "privilege" must come within the scope of the Clause. "The Clause '. . . establishes a norm of comity without specifying the particular

subjects as to which citizens of one State coming within the jurisdiction of another are guaranteed equality of treatment.'" *Friedman*, 487 U.S. at 64, 108 S.Ct. 2260 (quoting *Austin*, 420 U.S. at 660, 95 S.Ct. 1191). Only those activities "'sufficiently basic to the livelihood of the Nation'" are protected. *Friedman*, 487 U.S. at 64, 108 S.Ct. 2260 (quoting *Baldwin v. Montana Fish & Game Comm'n*, 436 U.S. 371, 388, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978)). Other "distinctions between residents and nonresidents merely reflect the fact that this is a Nation composed of individual States." *Baldwin*, 436 U.S. at 383, 98 S.Ct. 1852.

█ Where a protected privilege or immunity is implicated, the State may defeat the challenge by showing sufficient justification for the discrimination, *i.e.*, "'something to indicate that non-citizens constitute a peculiar source of the evil at which the statute is aimed.'" *Hicklin*, 437 U.S. at 526, 98 S.Ct. 2482 (quoting *Toomer*, 334 U.S. at 398, 68 S.Ct. 1156); *see also United Bldg. & Constr. Trades Council of Camden County & Vicinity v. Mayor & Council of Camden*, 465 U.S. 208, 222, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984). A state may defend its position by demonstrating: "(a) a substantial reason for the discrimination, and (b) a reasonable relationship between the degree of discrimination exacted and the danger sought to be averted by enactment of the discriminatory statute." [27] *Crotty*, 346 F.3d at 94; *see also*

---

**26.** Although the Clause uses the term citizens, residency and citizenship are "essentially interchangeable" for analytical purposes. *Friedman*, 487 U.S. 59, 64, 108 S.Ct. 2260, 101 L.Ed.2d 56 (1998); *see also Austin*, 420 U.S. at 662 n. 8, 95 S.Ct. 1191.

**27.** The Privileges and Immunities Clause and the so-called Dormant Commerce Clause have much in common: they share a common origin, are "mutually reinforcing," *see Hicklin*,

437 U.S. at 531, 98 S.Ct. 2482, are often used to challenge the same statute, *see, e.g., Ward v. Maryland*, 79 U.S. (12 Wall.) 418, 432–33, 20 L.Ed. 449 (1870) (Bradley, J., concurring); *Toomer*, 334 U.S. at 407–09, 68 S.Ct. 1156 (Frankfurter, J., concurring); *Crotty*, 346 F.3d at 100 n. 16; *Swedenburg v. Kelly*, 358 F.3d 223 (2d Cir.2004), and, in some instances, the jurisprudence of one may inform that of the other, *see, e.g., Hicklin*, 437 U.S. at 531–34, 98 S.Ct. 2482; *Crotty*, 346 F.3d at 98. Nonethe-

*Lunding v. New York Tax Appeals Tribunal*, 522 U.S. 287, 298, 118 S.Ct. 766, 139 L.Ed.2d 717 (1997). "The availability of less restrictive means is considered when evaluating the measure and degree of the relationship between the discrimination and state interest." *Crotty*, 346 F.3d at 94; *see also Friedman*, 487 U.S. at 67, 108 S.Ct. 2260; *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 284, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985). This evaluation must "be conducted with due regard for the principle that States should have considerable leeway in analyzing local evils and prescribing appropriate cures." *Toomer*, 334 U.S. at 396, 68 S.Ct. 1156, *quoted in Lunding*, 522 U.S. at 298, 118 S.Ct. 766.

■■■ Insofar as a plaintiff challenges a State's discrimination against him with regard to privileges and immunities—an "as-applied" challenge—he need only demonstrate that his own "nonresidency presents [no] special threat to any of the State's interests that is not shared" by residents. *Piper*, 470 U.S. at 289, 105 S.Ct. 1272 (White, J., concurring); *see also Crotty*, 346 F.3d at 100. A facial challenge is more burdensome. *See Velazquez v. Legal Servs. Corp.*, 164 F.3d 757, 763 (2d Cir. 1999). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exist under which the Act

would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Thus, to succeed on a facial challenge, the plaintiff must show an absence of "any circumstances under which th[e] statute avoids a constitutional reckoning with the Privileges and Immunities Clause." *Crotty*, 346 F.3d at 100 (citing *Velazquez*, 164 F.3d at 763).

**B**

■■■ Bach argues that New York's licensing regime discriminates against nonresidents with regard to a protected right under Article IV's Privileges and Immunities Clause without sufficient justification. Defendants do not dispute that New York's laws discriminate against nonresidents, who, unlike residents, may only apply for a license if they work principally within the State. Instead, they respond, first, that possession of a firearm is not within the ambit of the Privileges and Immunities Clause and, second, that, even if the Clause did apply, New York's pistol permit scheme would remain valid because it "is closely related to a substantial state interest in restricting firearms possession to persons of acceptable temperament and character."

**1**

Bach can prevail only if New York's grant of an Article 400 license should be considered a "privilege" under Article IV.

less, different tests govern each. A statute will survive a Privileges and Immunities analysis if a State can demonstrate a "substantial" interest that is, as variously described, "reasonably," *Toomer*, 334 U.S. at 399; *Crotty*, 346 F.3d at 94, "substantial[ly]," *Hicklin*, 437 U.S. at 527, 98 S.Ct. 2482; *United Bldg.*, 465 U.S. at 222, 104 S.Ct. 1020; *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 284, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985), or "closely," *Friedman*, 487 U.S. at 65, 108 S.Ct. 2260, related to the discriminatory means employed. By contrast, under the Dormant

Commerce Clause, "[d]iscrimination against interstate commerce in favor of local business or investment is *per se* invalid, save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *C & A Carbone v. Town of Clarkstown*, 511 U.S. 383, 392, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994); *see also Swedenburg*, 358 F.3d at 238 ("When a state statute, whether on its face or in effect, discriminates against interstate commerce, it is virtually per se invalid ....").

Neither the Supreme Court, this Court, nor any other Court of Appeals has considered whether the Privileges and Immunities Clause protects what Bach calls "the right to self-defense through the use of a firearm." Indeed, "[m]any, if not most, [Supreme Court] cases expounding the Privileges and Immunities Clause have dealt with th[e] basic and essential activity" of pursuing "a common calling." *United Bldg.*, 465 U.S. at 219, 104 S.Ct. 1020; *see also Crotty*, 346 F.3d at 95 (collecting cases).[28] Nonetheless, the Supreme Court "has never held that the Privileges and Immunities Clause protects only economic interests," *Piper*, 470 U.S. at 281 & n. 11, 105 S.Ct. 1272 (stating that the noncommercial role of a lawyer falls within the Clause); *see also Doe v. Bolton*, 410 U.S. 179, 200, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) (striking residency requirement in abortion statute), and Bach contends that the right to carry a handgun is one of the non-economic interests protected by the Clause.

As support, Bach is in the awkward position of relying on dicta from the Su-preme Court's opinion in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1857).[29] Chief Justice Taney in *Dred Scott* suggested that an attribute of citizenship, in addition to the right to migrate from one state to another, was the right to possess arms. The Chief Justice wrote:

> [I]t cannot be believed that the large slaveholding States regarded [blacks] as included in the word citizens, or would have consented to a Constitution which might compel them to receive them in that character from another State. For if they were so received, and entitled to the privileges and immunities of citizens, it would exempt them from the operation of the special laws and from the police regulations which they considered to be necessary for their own safety. It would give to persons of the negro race, who were recognized as citizens in any one State, the right to enter every other State whenever they pleased, singly or in companies, without pass or passport, and without obstruction, . . . and to keep and carry arms wherever they went.

---

**28.** The Supreme Court "repeatedly has found that 'one of the privileges which the Clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with citizens of that State.'" *Piper*, 470 U.S. at 280, 105 S.Ct. 1272 (quoting *Toomer*, 334 U.S. at 396, 68 S.Ct. 1156).

**29.** Bach also argues that *Patsone v. Pennsylvania*, 232 U.S. 138, 34 S.Ct. 281, 58 L.Ed. 539 (1914), supports his position that the Privileges and Immunities Clause encompasses the right to carry a handgun. It does not. In *Patsone*, the Supreme Court considered an equal protection challenge to a Pennsylvania statute that discriminated against aliens by limiting their rights to own shotguns and rifles. *See id.* at 141, 143, 34 S.Ct. 281. The Court had no opportunity to consider the Privilege and Immunities Clause.

Moreover, to the extent that dicta from *Patsone* might have indicated, as Bach suggests, that the right to own a pistol is protected as a fundamental right under the Equal Protection Clause, this Circuit has rejected that position. *See United States v. Toner*, 728 F.2d 115, 128 (2d Cir.1984) ("[The] right to possess a gun is clearly not a fundamental right."); *see also Lewis v. United States*, 445 U.S. 55, 65 & n. 8, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980) (reviewing firearms restrictions for a rational basis and noting, "[L]egislative restrictions on the use of firearms . . . do [not] trench upon any constitutionally protected liberties."); *United States v. Darrington*, 351 F.3d 632, 635 (5th Cir.2003); *Olympic Arms v. Buckles*, 301 F.3d 384, 388–89 (6th Cir.2002); *United States v. Hancock*, 231 F.3d 557, 565–66 (9th Cir. 2000); *Gillespie v. City of Indianapolis*, 185 F.3d 693, 709 (7th Cir.1999); *United States v. Synnes*, 438 F.2d 764, 771 & n. 9 (8th Cir. 1971). Thus, Bach has nothing here to gain by equating protected rights under the Equal Protection Clause with the "privileges" of Article IV.

*Id.* at 417. "The logic of Taney's argument at this point seems to be that, because it was inconceivable that the Framers could have genuinely imagined blacks having the right to possess arms, it follows that they could not have envisioned them as being citizens, since citizenship entailed that right." Sanford Levinson, *The Embarrassing Second Amendment*, 99 YALE L.J. 637, 651. Bach contends that "[t]his is powerful evidence of what rights the Supreme Court understood the Clause protects, although its protections wrongly were denied to an entire class of people." Defendants, by contrast, would have us view the Chief Justice's comments as inconsequential dicta, inserted "to bolster [the] holding" by "raising the specter of slave revolt."

This is not the occasion to weigh the import, if any, of Chief Justice Taney's ruminations. Because we agree with defendants and the district court that New York's licensing scheme is sufficiently justified, *see Bach*, 289 F.Supp.2d at 226–28, we will assume, without deciding, that entitlement to a New York carry license is a privilege under Article IV.

### 2

There is no question that New York discriminates against nonresidents in providing handgun licenses under Article 400. Defendants do not contest this fact. Instead, they argue that the discrimination is sufficiently justified by New York's public safety interest in monitoring handgun licensees.[30] We do not doubt, and Bach does not dispute, that "[t]he State has a substantial and legitimate interest ... in insuring the safety of the general public from individuals who, by their conduct, have shown themselves to be lacking the essential temperament or character which should be present in one entrusted with a dangerous instrument." *In re Pelose*, 53 A.D.2d 645, 645, 384 N.Y.S.2d 499 (2d Dep't 1976).[31]

New York's monitoring interest is, in essence, an interest in continually obtaining relevant behavioral information. The State's licensing scheme vests broad revocation discretion in a local licensing officer, permitting that officer to revoke a license on the basis of a wide variety of behavioral data, including information reported from local incidents. *See, e.g., Finley*, 272 A.D.2d 831, 708 N.Y.S.2d 190; *Harris*, 57 A.D.2d 778, 394 N.Y.S.2d 210. The operative information available to licensing officers is not restricted to the legal formalities of an arrest warrant, an accusatory instrument, or a judgment of conviction. Licensing officers have the discretion to revoke licenses upon displays of "poor judgment," *see, e.g., Lang*, 205 A.D.2d at

---

**30.** Defendants also argue that New York's residency requirement enables "local licensing officers to make informed decisions about the suitability of applicants." The district court credited this argument. *See Bach*, 289 F.Supp.2d. at 227. However, because we hold that New York's monitoring rationale is a sufficient justification, we do not consider New York's interest in the initial licensing determination.

**31.** This interest extends to the State's ability to monitor licensees' "good character, competency and integrity," *see* N.Y. Penal Law § 400.00(3), including their mental fitness, *see Harris*, 57 A.D.2d at 778, 394 N.Y.S.2d 210,

composure, *see Gerard*, 307 A.D.2d at 633, 762 N.Y.S.2d 533; *Finley*, 272 A.D.2d at 831, 708 N.Y.S.2d 190, maturity of judgment, *see Lang*, 205 A.D.2d at 783, 614 N.Y.S.2d 41; *In re Papaioannou*, 14 A.D.3d 459, 459, 788 N.Y.S.2d 378 (1st Dep't 2005), and safe or unsafe habits, *see In re Ehrlich*, 99 A.D.2d at 545, 471 N.Y.S.2d 628; *Zalmanov*, 240 A.D.2d at 173, 657 N.Y.S.2d 691. In the case of a carry licensee, it also includes the State's ability to monitor continuing "proper cause." *See* N.Y. Penal Law § 400.00(2)(f); 1991 N.Y. Op. Atty. Gen. (Inf.) 72, 1991 N.Y. A.G. LEXIS 84, at *3.

783, 614 N.Y.S.2d 41, dangerous paranoia, *see, e.g., Harris,* 57 A.D.2d at 778, 394 N.Y.S.2d 210, or violations of permit restrictions, *see, e.g., Brookman v. Dahaher,* 234 A.D.2d 615, 615–16, 650 N.Y.S.2d 879 (3d Dep't 1996).

But the degree of discrimination exacted must be substantially related to the threatened danger. *See Crotty,* 346 F.3d at 94. This is the more difficult inquiry: with regard to New York's monitoring interest, is there any "particularized evil presented uniquely by nonresident[s] . . . that warrants the degree of outright discrimination imposed"? *Crotty,* 346 F.3d at 98. Defendants argue:

> The ongoing flow of information to a licensing officer as a result of the licensee's tie to a particular residence or community is an important element of the State's regulatory scheme. It substantially increases the likelihood that a licensing officer will be alerted to facts that cast doubt on a licensee's fitness to possess a firearm.

Appellee's Br. at 19–20. Bach challenges the substantiality of this relationship. He contends: (1) nonresidents within the State are no more difficult to monitor than residents, and (2) New York has not shown that it could not obtain the same quality of information from other States. Thus, Bach concludes, defendants have not shown any "palpable and unique risks" posed by out-of-state residents. We disagree.

First, although it may be true that New York can monitor nonresidents as easily as residents while either are in the State, New York has an interest in the entirety of a licensee's relevant behavior. Information regarding a licensee's adherence to license conditions is information that may only exist when the gun owner is in-state, but information regarding the licensee's character and fitness for a continued license is not so limited. New York has just as much of an interest, for example, in discovering signs of mental instability demonstrated in New Jersey as in discovering that instability in New York. The State can only monitor those activities that actually take place in New York. Thus, New York can best monitor the behavior of those licensees who spend significant amounts of time in the State. By limiting applications to residents and in-state workers, New York captures this pool of persons. It would be much more difficult for New York to monitor the behavior of mere visitors like Bach, whose lives are spent elsewhere.[32]

Second, we think it self-evident that, at least in Bach's case, other States, like Virginia, cannot adequately play the part of monitor for the State of New York or provide it with a stream of behavioral information approximating what New York would gather. They do not have the incentives to do so. First, other States are not bound to impose a discretionary revocation system like New York's.[33] There-

---

**32.** Bach does not allege that he spends as much time in New York as a local resident or worker and does not argue, accordingly, that New York would have equally adequate opportunities to monitor him.

**33.** Indeed, Virginia appears to have a system quite different from New York's. Whereas New York vests extraordinary discretion in licensing officers to deny or revoke licenses on the basis of "proper cause" and "good character, competency and integrity" stan-

dards, in 1995, Virginia deleted its more general "good character" standard and replaced it with specific enumerated grounds for disqualification. *See* Va.Code § 18.2–308; 1995 Va. Op. Atty. Gen. 130, 1995 WL 677533, at *1 (explaining change in Code from a "good character" standard to enumerated disqualification rules). Virginia's Attorney General concluded that a gun-permitting decision in the Commonwealth may be based only on the statutorily required information and that

fore, they need not engage in monitoring of licensees similar to New York's monitoring. Second, because a New York license operates only in New York, other States, like Virginia, have very little to gain from a revocation of a New York license—a revocation would affect the safety of New Yorkers, not Virginians. Obviously, New Yorkers have a much greater interest in reporting misbehavior to New York local licensing officers than do out-of-state persons and their government officers. Monitoring is incentive-driven; without these incentives, there is little reason to expect effective monitoring, if any.[34]

Moreover, Bach does not point to any adequate alternative method for New York to collect this information. Bach argues that New York can and does rely on out-of-state reporting and cites Penal Law § 400.00(11), which provides for revocation or suspension of a license upon the conviction of a felony or serious offense "anywhere." But New York's system permits license revocations for a range of misbehavior of which serious offenses and felonies form only a small part, and Bach does not point to any reason to expect Virginia or any other State to report such behavior to New York. Bach also suggests that New

York could require nonresidents to submit to more frequent renewals or periodic interviews with local officials. However, New York's proffered interest is in monitoring the relevant day-to-day behavior of license-holders; it is unclear how an accelerated renewal schedule or a round of interviews with local officials would supply this information.

Bach also suggests that reference letters or certifications from a nonresident's local authorities could fill New York's informational gap. Perhaps in other contexts references or similar informational requests might provide an adequate substitute source of information. For instance, when a State has an interest in monitoring the fitness of a licensed professional, references from persons involved in professional relationships with the licensee might be an adequate source of information. Or, where a State has an interest in monitoring the fitness of a licensed user of some universally-insured activity—driving an automobile, for instance—submission of updated insurance reports might prove adequate. In both examples, there may be strong arguments that another party has an equally strong incentive to monitor the licensee's relevant behavior—the profes-

---

courts are "not authorize[d] ... to require additional information for determining the advisability of granting an applicant a permit for reasons not enumerated in the statute." *Id.* at *2.

We need not determine whether a plaintiff from a State employing a system substantially similar to New York's would be able to demonstrate a non-discriminatory and adequate substitute means for New York to satisfy its interest in monitoring nonresidents. We would note, however, that the Supreme Court has stated, albeit in the context of taxes challenged under the Clause, that "the constitutionality of one State's statutes affecting nonresidents [cannot] depend upon the present configuration of the statutes of another State." *Lunding*, 522 U.S. at 314, 118 S.Ct. 766 (quoting *Austin*, 420 U.S. at 668, 95 S.Ct.

1191); *cf. Travis v. Yale & Towne Mfg. Co.*, 252 U.S. 60, 81–82, 40 S.Ct. 228, 64 L.Ed. 460 (1920).

**34.** Bach points out that New York's monitoring process involves information-sharing between counties and suggests that there is no difference between county-to-county sharing within New York and sharing between out-of-state and in-state localities. But New York counties have the two important monitoring and reporting incentives, discussed above, that out-of-state localities lack: first, counties operate under New York's revocation regime and, second, because a New York carry license may be valid throughout the State, counties internalize the effects of an unfit or dangerous licensee and have much to gain from a timely revocation.

sional's clients will often have a personal stake in the professional's work; the insurer will have a financial stake in the insured's risk profile. Here, however, Bach has not pointed to any monitor with a similar interest in assessing a nonresident's fitness to carry a handgun. Other States are not bound by New York's monitoring system. Thus, Bach has not shown how New York could "protect its interests through less restrictive means." *Piper*, 470 U.S. at 287, 105 S.Ct. 1272.

New York's monitoring rationale is distinct from rationales rejected in other Privileges and Immunities Clause cases. Most importantly, the monitoring rationale is not an interest of merely "general concern," to which a resident/nonresident distinction would not be tailored,[35] but, rather, actually turns on where a person spends his or her time. The exception for nonresidents working in-state is consistent with this criterion. The exception also further distinguishes New York's license requirements from those invalidated in *Piper* and *Friedman*. There, nonresident lawyers were denied admittance to the bar even though their primary places of business were within the licensing State. *See Piper*, 470 U.S. at 275–76, 105 S.Ct. 1272; *id.* at 288, 105 S.Ct. 1272 (White, J., concurring); *Friedman*, 487 U.S. at 61, 68–69, 108 S.Ct. 2260. Here, by contrast, nonresidents with their primary place of business

in New York are eligible for an Article 400 license. *See* N.Y. Penal Law § 400.00(3)(a). New York's exception is relevant because the location of a licensee's principal employment correlates with the State's monitoring interest in a manner similar to the place of the licensee's residence—both present opportunities for the State to monitor the licensee.[36] New York's nonresident distinction, with the in-state worker exception, is thus tailored to the State's monitoring interest.

Defendants have demonstrated that "'non-citizens constitute a peculiar source of the evil at which the statute is aimed.'" *Hicklin*, 437 U.S. at 526, 98 S.Ct. 2482 (quoting *Toomer*, 334 U.S. at 398, 68 S.Ct. 1156). They have "'no [more] burden to prove that [the State's] laws are not violative of the . . . Clause.'" *Id.* (quoting *Baldwin*, 436 U.S. at 402, 98 S.Ct. 1852 (Brennan, J., dissenting)). Bach's failure to prevail on his as-applied challenge renders his facial challenge likewise invalid. Accordingly, we affirm the district court's rejection of Bach's Privileges and Immunities Clause claim. *Cf. In re Ware*, 474 A.2d 131 (Del.Sup.Ct.1984); *Perez*, 67 Misc.2d at 911–13, 325 N.Y.S.2d 183.

## VI

Theories regarding constitutional protections for the "right to keep and bear

---

**35.** *See, e.g., Crotty*, 346 F.3d at 99; *see also Toomer*, 334 U.S. at 397–99, 68 S.Ct. 1156. *Cf. Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); *C & A Carbone, Inc. v. Town of Clarkstown, New York*, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399.

**36.** It is quite possible that many other State interests, including those considered in *Piper* and *Friedman*, might not substantially correlate with domicile. The New Jersey Supreme Court, for instance, concluded that there is only a weak correlation, at best, between that State's interest in its lawyers' qualifications

and a lawyer's place of domicile. *See In re Sackman*, 90 N.J. 521, 448 A.2d 1014, 1021 (1982). The New Jersey Supreme Court explained that "[t]he premise . . . that the mere fact of *living* in New Jersey makes it more likely, and more to the point, sufficiently more likely, that that lawyer will be more competent, accessible and accountable than the one who is living in another state[,] . . . [if] true, . . . is only marginally true." *Id.* Here, by contrast, the fact that a licensee lives in New York makes it sufficiently more likely that the State will be able to monitor him.

arms" have moved from the pages of law reviews to those of the Federal Reporters. Perhaps soon they will make their way into the United States Reports. Bach presents two theories of protected rights to arms—protection under the Second Amendment and the Privileges and Immunities Clause of Article IV—but this is not the case in which to decide the propriety of either. The Second Amendment cannot apply to the States in light of *Presser,* and the Privileges and Immunities Clause cannot preclude New York's residency requirement in light of the State's substantial interest in monitoring handgun licensees.

For the foregoing reasons, the district court's judgment of September 23, 2003 is hereby AFFIRMED.